STATE OF CONNECTICUT *v.* IVAN CEPEDA
(AC 16082)

Landau, Schaller and Healey, Js.

Argued September 15, 1998—officially released January 5, 1999

*Paul R. Kraus*, for the appellant (defendant).

*Paul J. Ferencek*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *David J. Strollo*, assistant state's attorney, for the appellee (state).

### Opinion

HEALEY, J. The defendant, Ivan Cepeda, appeals from the judgment of conviction,[1] following a jury trial,

---

[1] The three crimes of which the defendant was convicted were counts one, three and five of a five count substituted information. Counts two and four of that information charged the defendant with assault in the first degree as an accessory in violation of General Statutes §§ 53a-8 and 53a-59 (a) (1) and with attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-59 (a) (1), respectively, as alternative theories of liability to be considered by the jury only if it did not find the defendant guilty of assault in the first degree as charged in count one.

of assault in the first degree in violation of General Statutes § 53a-59 (a) (1),[2] conspiracy to commit assault in the first degree in violation of General Statutes §§ 53-48 (a)[3] and 53a-59 (a) (1) and carrying a pistol without a permit in violation of General Statutes § 29-35.[4]

On appeal, the defendant claims that the trial court improperly (1) restricted the cross-examination of the state's eyewitnesses concerning the charged incident of August 1, 1993, (2) failed to conduct a *Batson*[5] hearing concerning the state's use of a peremptory challenge on a prospective juror, (3) admitted uncharged misconduct that did not bear a sufficient relation to the charges to have any probative value, (4) denied the defendant's motion to allow the defense to inspect notes taken by the prosecutor during his conversation with the witness Joel Coban pursuant to General Statutes § 54-86b[6] and (5) allowed the rebuttal testimony of Joseph Lawlor, an inspector for the state, because it did not address the credibility of any defense witness. We affirm the judgment of the trial court.

[2] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

[3] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[4] General Statutes § 29-35 provides in relevant part: "(a) No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same issued as provided in section 29-28. . . ."

[5] *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

[6] General Statutes § 54-86b (a) provides: "In any criminal prosecution, after a witness called by the prosecution has testified on direct examination, the court shall on motion of the defendant order the prosecution to produce any statement oral or written of the witness in the possession of the prosecution which relates to the subject matter as to which the witness has testified,

The jury reasonably could have found the following facts. On August 1, 1993, the victim, Anibal Torres, and his brother drove his girlfriend, Christine Barker, and her two year old daughter, Emily, to 63 Winthrop Avenue in New Haven where the defendant lived with his parents and five brothers. The defendant is Emily's father. Barker was bringing Emily to visit with her grandmother, the defendant's mother. Barker was romantically involved with the defendant previously, but after Emily was born she had left the defendant to date the victim. She resumed her relationship with the defendant, however, while pregnant with the victim's son, but returned to the victim after the birth of his son. The victim and the defendant had been on poor terms since Barker had broken up with the defendant and became pregnant by the victim.

The victim parked his car across the street from the defendant's home on Winthrop Avenue, and he and his brother remained in the car. Barker got out of the car with Emily, crossed Winthrop Avenue and knocked on the front door, which was answered by Emily's grandmother. At that time, the defendant, his brothers Frank Cepeda and Luis Cepeda, his uncle and another individual went across Winthrop Avenue toward the car in which the victim was sitting. The victim testified that they said that they were "going to fight me." The victim got out of his car and a fight started. The victim hit the defendant, who fell down, and all of the men started fighting in the street. The defendant "screamed" for someone "to get the gun." The defendant's uncle went into the house, came out with a small grayish-black handgun and fired a shot toward the victim. During this melee, the uncle approached the victim's brother, who was being held down on the ground by the defendant's brothers Frank and Luis, and pointed the gun at his

and the court shall order said statement to be delivered directly to the defendant for his examination and use."

head. Barker moved into the street, and pushed the uncle with the gun away from the victim's brother. As she did so, the "gun went off and nothing came out," having apparently jammed. The defendant then obtained the handgun from his uncle.

The victim's brother stabbed the defendant's brother, Frank Cepeda, in the leg with a knife, which caused a minor wound to his thigh. The victim ran toward his car and, as he was attempting to get in, the defendant fired at least two shots at the victim. Two bullets struck the victim. One bullet passed through his left arm and another penetrated his chest fracturing his fourth thoracic vertebra.

Two brothers, Demetrius Coban and Joel Coban, who had been walking their dog in the area, witnessed the incident. They each saw the defendant point the handgun toward the victim and fire two shots. The victim's brother and Barker helped him into the car and drove him to Yale-New Haven Hospital.[7]

The jury heard and observed fourteen witnesses called by the state and seven witnesses called by the defense. The state also called another witness on rebuttal. The defendant did not take the witness stand.

I

The defendant claims that his federal and state[8] constitutional rights were violated when the trial court declined to let him cross-examine the victim, Barker,

---

[7] The victim underwent spinal cord surgery at that hospital. The bullet that fractured his fourth thoracic vertebra was removed. The shooting has left him a paraplegic from the level of his fourth thoracic vertebra.

[8] The defendant has not provided an independent analysis under the state constitution. We will, therefore, confine our analysis to a discussion of his rights under the federal constitution, namely, the sixth and fourteenth amendments to the United States constitution. See *State* v. *Beliveau*, 237 Conn. 576, 582 n.4, 678 A.2d 924 (1996); *State* v. *Vincent*, 229 Conn. 164, 168 n.5, 640 A.2d 94 (1994).

Demetrius Coban and Joel Coban on whether these eyewitnesses had seen the victim's brother stab Frank Cepeda in the leg. He claimed that he was entitled to do so to impeach their credibility, to test their powers of recollection and abilities to observe and to set out a time continuum of events. The defendant made essentially the same claim several times as the state presented each of these eyewitnesses.

This issue requires the recital of certain additional facts. After the victim had testified on cross-examination that he had not seen "any knives," the defendant, in the absence of the jury, first made his claim that he be permitted to cross-examine the victim on the basis already stated. The state objected on relevancy grounds, claiming that such an inquiry would be a collateral issue. The trial court ruled that while it arguably might have some relevance, allowing the requested inquiry could rapidly develop into collateral issues and tend to confuse the jury. The trial court pointed out that the defendant would have ample opportunity to cross-examine the victim to test and explore his powers of recollection and observation. It did, however, state that it would allow the defendant to ask the victim if he saw anyone with a knife, but precluded him from asking the victim if he had actually seen the stabbing incident. Thereafter, in the presence of the jury and upon further cross-examination, the victim stated that he had not seen anyone with a knife.

Again, upon cross-examination of Demetrius Coban, Joel Coban and Barker, defense counsel, asserting the same grounds, pressed his claim to cross-examine each concerning the stabbing. The state again objected, arguing that the issue involved was whether the defendant shot, attempted to shoot or assisted another person in shooting the victim, and that the matter of the stabbing incident claimed between the victim's brother and Frank Cepeda was a collateral issue. In the course of

pressing his request to the court, defense counsel stated that he anticipated presenting testimony from individuals, including Frank Cepeda, as to how he was stabbed and the surrounding circumstances. He argued that this was relevant to impeaching the witnesses' credibility and their powers of recollection and observation. The state maintained that the defendant's argument was based on his assumption that, if that inquiry was allowed, the state's eyewitnesses would testify that they did not see the stabbing. The trial court again precluded defense counsel from cross-examining these witnesses about the stabbing. Thereafter, defense counsel, in cross-examining the witnesses, did not ask if they had seen a knife.

The analysis of the defendant's claim of improper restriction of his right of cross-examination is guided by familiar constitutional principles relevant to cross-examination by a defendant in a criminal trial. "It is axiomatic that the defendant is entitled fairly and fully to confront and to cross-examine the witnesses against him. U.S. Const., amends. VI, XIV . . . *Davis* v. *Alaska*, 415 U.S. 308, 318, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); *Chambers* v. *Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); *Pointer* v. *Texas*, 380 U.S. 400, 403–404, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965) . . . . The primary interest secured by confrontation is the right to cross-examination; *Douglas* v. *Alabama*, 380 U.S. 415, 418, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965); and an important function of cross-examination is the exposure of a witness' motivation in testifying. *Greene* v. *McElroy*, 360 U.S. 474, 496, 79 S. Ct. 1400, 3 L. Ed. 2d 1377 (1959). Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. *State* v. *Lubesky*, 195 Conn. 475, 481–82, 488 A.2d 1239 (1985). In order to comport with the constitutional standards embodied in the confrontation clause, the trial court

must allow a defendant to expose to the jury facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. *Davis* v. *Alaska*, [supra, 318]; *State* v. *Lubesky*, supra, 482. . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Beliveau*, 237 Conn. 576, 584–85, 678 A.2d 924 (1996).

The United States Supreme Court has said: "Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Emphasis in original.) *Delaware* v. *Fensterer*, 474 U.S. 15, 20, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985); see *State* v. *Joyner*, 225 Conn. 450, 478, 625 A.2d 791 (1993); *State* v. *Jones*, 22 Conn. App. 665, 667, 578 A.2d 667 (1990). The *Beliveau* court also said: "The confrontation clause does not, however, suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. *State* v. *Johnson*, 21 Conn. App. 291, 293, 573 A.2d 1218 (1990). Only relevant evidence may be elicited through cross-examination. *State* v. *Gaynor*, 182 Conn. 501, 509, 438 A.2d 749 (1980). The court determines whether the evidence sought on cross-examination is relevant by determining whether that evidence renders the existence of [other facts] either certain or more probable. . . . *State* v. *Kelly*, 208 Conn. 365, 376, 545 A.2d 1048 (1988). . . . *State* v. *Kelley*, 229 Conn. 557, 562, 643 A.2d 854 (1994)." (Internal quotation marks omitted.) *State* v. *Beliveau*, supra, 237 Conn. 585.

"The trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. [*State* v. *Barnes*, 232 Conn. 740, 746–47, 657 A.2d 611 (1995)]; *Williams Ford, Inc.* v. *Hartford Courant*

*Co.*, 232 Conn. 559, 569, 657 A.2d 212 (1995); *State* v. *Kelley,* supra, 229 Conn. 563; *State* v. *Hernandez,* 224 Conn. 196, 208, 618 A.2d 494 (1992) . . . ." (Citations omitted.) *State* v. *Beliveau,* supra, 237 Conn. 585–86. "The proffering party bears the burden of establishing the relevance of the offered testimony." Id., 586.

" 'In determining whether a defendant's right of cross-examination has been unduly restricted, we consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial.' *State* v. *Roma,* 199 Conn. 110, 116, 505 A.2d 717 (1986)." *State* v. *Santiago,* 224 Conn. 325, 331, 618 A.2d 32 (1992).

"The general rule is that restrictions on the scope of cross-examination are within the sound discretion of the trial judge . . . but this discretion comes into play only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment." (Citations omitted.) *State* v. *Gaynor,* supra, 182 Conn. 508; see also *State* v. *Thompson,* 191 Conn. 146, 148, 463 A.2d 611 (1983). We must, therefore, conduct a two-step analysis, determining first whether the cross-examination permitted to defense counsel comported with sixth amendment standards; see *Davis* v. *Alaska,* supra, 415 U.S. 308; and second whether the trial court abused its discretion in restricting the scope of that cross-examination. See *State* v. *Gaynor,* supra, 510; *State* v. *Castro,* 196 Conn. 421, 424, 493 A.2d 223 (1985); *State* v. *Payne,* 219 Conn. 93, 111, 591 A.2d 1246 (1991); *State* v. *Colon,* 28 Conn. App. 231, 235–36, 611 A.2d 902, cert. denied, 223 Conn. 922, 614 A.2d 827 (1992). "The constitutional standard is met when defense counsel is 'permitted to expose to the jury the facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the

reliability of the witness.' *Davis* v. *Alaska,* supra, 318; *United States* v. *Vasilios,* [598 F.2d 387, 389 (5th Cir. 1979)]." *State* v. *Gaynor,* supra, 509.

"To establish an abuse of discretion, [the defendant] must show that the restrictions imposed upon [the] cross-examination were clearly prejudicial. *United States* v. *Elliott,* 571 F.2d 880, 909 (5th Cir. 1978); *Gordon* v. *United States,* 438 F.2d 858, 865 (5th Cir. 1971). *State* v. *Gaynor,* supra, [182 Conn. 510]; see *State* v. *Shindell,* 195 Conn. 128, 141, 486 A.2d 637 (1985). Once it is established that the trial court's ruling on the scope of cross-examination is not constitutionally defective, this court will apply [e]very reasonable presumption . . . in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. *State* v. *Briggs,* 179 Conn. 328, 333, 426 A.2d 298 (1979), cert. denied, 447 U.S. 912, 100 S. Ct. 3000, 64 L. Ed. 2d 862 (1980)." (Internal quotation marks omitted.) *State* v. *Castro,* supra, 196 Conn. 426.

Initially, we determine that as to the evidence of the stabbing, which the defendant argues was an "integral" part of the melee and that he endeavored to elicit from the state's eyewitnesses, the trial court correctly ruled that the evidence was irrelevant and that its admission would tend to confuse the jury with collateral issues. " 'Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue.' " *State* v. *Coleman,* 241 Conn. 784, 788, 699 A.2d 91 (1997), quoting *State* v. *Prioleau,* 235 Conn. 274, 305, 664 A.2d 743 (1995). The crucial issue in this case was whether the defendant shot, attempted to shoot or assisted another person in shooting the victim. The issue of who might have done the stabbing was collateral. Not only did the stabbing not implicate the victim or the defendant, but defense counsel specifically agreed at trial that the victim did not in any way participate in the stabbing. In addition, as the state argues, the jury was

not called upon to decide whether other parties in the melee were injured.

The trial court's precluding the defense from cross-examining the state's eyewitnesses about the stabbing did not completely bar the defense from exposing facts to the jury to permit it to assess and draw inferences concerning the reliability of these eyewitnesses. We are aware that the defense argued that it should be permitted to do so because it would serve to impeach the state's eyewitnesses' credibility and power of recollection and observation, as well as to establish a time continuum of events. Our examination of the trial transcript discloses that the trial court carefully considered and weighed the necessary elements when ruling as to all of the state's eyewitnesses. Even if, as the state argues, it is assumed that the state's eyewitnesses would have testified that they had not seen the stabbing, that evidence would not have impeached their credibility or their power to recollect and observe events. In that regard, it is fair to say that none of these eyewitnesses testified on direct examination that they witnessed the melee in its entirety. The victim said that he was preoccupied with the defendant and the defendant's uncle and that he did not even see Demetrius Coban and Joel Coban, both of whom he knew.

Ruth Pelletier, a neighbor who was an eyewitness, testified that she heard a "loud noise outside" her house. Barker did see the defendant and those with him approach the victim's car, but did not see the victim exit his car because she was on the front porch of the Cepeda home talking with the defendant's mother. She said things happened "very fast" and when she heard shots she saw her daughter in the middle of the street and "ran for her" and that she "couldn't be worried about what was going on with anybody else." Under these circumstances, we agree that the trial court reasonably could have concluded that testimony from

these eyewitnesses, as sought by the defendant, would not reasonably undermine their credibility or their ability to observe and recollect the shooting.

The defendant's claim that the stabbing incident was "integral" and would have been "particularly memorable" for the victim and the other state eyewitnesses to recall is not persuasive. Here, the defendant argues that the trial court improperly excised an "integral" portion of this melee by its limitation of the cross-examination of the state's eyewitnesses. He, therefore, requested that he be permitted to elicit from his own eyewitnesses that during the melee, someone yelled for a knife and that the victim's brother stabbed Frank Cepeda, causing him to retreat from the melee. Defense counsel argued that such evidence was relevant because it tended to contradict the state's claims that the defendant yelled for a gun and that Frank Cepeda participated in holding the victim's brother on the ground. The state objected arguing that it was not relevant or necessary and that it was prejudicial. The trial court opined that this was "a different context from my prior rulings" and that it would allow the defendant to elicit testimony that Frank Cepeda was involved in a fight and that he was injured[9] and, because of that injury, withdrew from the fighting. The defendant's "integral" claim, however, is undermined by the fact that he did *not* question three of these four witnesses about the stabbing. Frank Cepeda was the only eyewitness who testified that he had been stabbed. Given the trial court's ruling that allowed the eliciting of such evidence and the defendant's use of that opportunity, he can hardly argue persuasively that the stabbing was "integral" to the shooting and that the

---

[9] At the same time, the trial court granted the defendant's request that he be permitted to elicit certain testimony from Edward Morrone, a New Haven police officer, who, with another officer, were the first police officers to arrive at the scene after the shooting. Over the state's objection that it would be collateral, the trial court ruled that it would allow Morrone to testify concerning his observations at that time.

stabbing would have been "particularly memorable" to the witnesses.[10]

We cannot say that the defendant's sixth amendment right of confrontation was improperly restricted as claimed. Defense counsel was amply permitted to expose to the jury facts from the state's eyewitnesses from which the jury as the sole trier of fact and credibility could properly draw inferences relating to the reliability of the witnesses. Despite the defendant's claim, the trial court extended broad latitude to the defense in the cross-examination of the state's eyewitnesses in the defendant's efforts to impeach their credibility and to explore their ability to observe and recollect. Defense counsel fully and incisively did so in pursuing its trial strategy.

The trial court correctly ruled that it was irrelevant to explore the stabbing incident as the defense proposed. It correctly ruled that the stabbing incident was not a relevant matter for inquiry and that it would be collateral. " '[T]he trial court has broad discretion in ruling on the admissibility [and relevancy] of evidence. *State* v. *Miller*, 202 Conn. 463, 482, 522 A.2d 249 (1987).' " *State* v. *Coleman*, supra, 241 Conn. 789. "A matter is considered collateral if the matter itself is not relevant in the litigation to establish a fact of consequence. . . . *United States* v. *Beauchamp*, 986 F.2d 1, 4 (1st Cir. 1993) (quoting 1 *McCormick on Evidence* § 45, at 169 (4th ed. 1992)." (Internal quotation marks omitted.) *United States* v. *Andujar*, 49 F.3d 16, 26 (1st Cir. 1995). In view of what we have said, the trial court

---

[10] Consequently, the defendant's claim that his proposed cross-examination of the state's eyewitnesses was relevant to establish a time continuum of events leading to the shooting must fail. We agree with the state that the defendant did not demonstrate at trial a fair reason how such a circumstance was essential to his defense. The defendant's brief, likewise, does not disclose such a reason.

did not abuse its broad discretion in ruling on the defendant's cross-examination claims.

## II

The defendant next claims that the trial court should have conducted a *Batson* hearing when the state exercised a peremptory challenge to excuse Quadry Harris, an African-American venireperson, on the basis of race. The defendant claims that the failure to conduct a "full hearing" under *Batson* violated the fourteenth amendment to the United States constitution and article first, § 20, of the constitution of Connecticut.[11]

The portions of the voir dire relevant to this issue disclose the following. At the time of trial, Harris had been employed as a supervising social worker for the department of children and families (DCF), supervising individuals investigating child abuse, and had dealt with situations involving domestic violence. During his ten years with DCF, Harris had a high degree of interaction with the police until he became a supervisor. His experience with the police has been both positive and negative and most of this contact has been through his work with DCF. Some years ago, however, while a student, he had a problem with his landlord over his security deposit. Harris called the landlord "too many times" trying to get his deposit back. The landlord said Harris was harassing him and Harris was arrested on a harassment charge. Harris never recovered his security deposit.

The defendant accepted Harris as a juror, but the state excused him by exercising a peremptory challenge. The defendant, at that point, stated: "I would ask for *Batson* reasons on this individual, Your Honor." The trial court then called on the state, which stated that it had challenged Harris because he was a social worker

---

[11] See footnote 8.

and had earlier been arrested for harassment.[12] The trial court ruled that the state had a racially neutral justification for peremptorily challenging Harris, and in doing so stated that there had "certainly . . . been no pattern of exclusion in this case . . . that there had been black jurors excused by both the state and the defense . . . ." The trial court also observed that it had not seen "any significant difference in the questions asked of Mr. Harris as opposed to the other witnesses. I think the state's format has been fairly consistent."

In *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), the United States Supreme Court held that, in a criminal trial, the state's exercise of peremptory challenges to exclude potential jurors on the basis of race violates the equal protection clause of the United States constitution. Under *Swain* v. *Alabama*, 380 U.S. 202, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1965), a precursor of *Batson*, a defendant was required to prove a systematic exclusion of members of a racial group from the petit jury to establish a constitutional violation. *Batson* modified that burden of proof and the defendant is no longer required to prove that peremptory challenges are used to deny equal protection in case after case, but now he may establish a prima facie case of purposeful discrimination in the selection of

---

[12] The state stated its position as follows:

"[Assistant State's Attorney]: The state feels, the neutral reasons are the state generally does not take social workers on cases. He's had a lot of interaction with police, although that's not part of it, but the fact is the harassment charge does bother the state, he was arrested on it, he had to go to court on it. The state feels that's a neutral enough reason. The state does not feel comfortable with that.

"The Court: Why do you not take social workers as a general rule . . . .

"[Assistant State's Attorney]: As a general rule, I have some good friends who are social workers, I feel they are more liberal and more inclined to—my experience with people who are social workers as far as making a decision they generally have a tough time making decisions as to someone's guilt or innocence.

"The Court: Anything else.

"[Assistant State's Attorney]: No, Your Honor."

the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. See *Batson* v. *Kentucky*, supra, 96; see *State* v. *Gonzalez*, 206 Conn. 391, 395, 538 A.2d 210 (1988). In *State* v. *Holloway*, 209 Conn. 636, 645–46, 553 A.2d 166, cert denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989), our Supreme Court, knowing that in the federal courts a defendant must make a prima facie showing of discrimination before the burden shifts to the state to provide a neutral explanation for the peremptory challenge, dispensed with the need for a defendant to make a prima facie case.[13] A neutral explanation means an explanation based on something other than the race of the juror. *State* v. *Thomas*, 50 Conn. App. 369, 377, 717 A.2d 828, cert. granted on other grounds, 247 Conn. 935, 722 A.2d 1217 (1998).

In *Thomas*, we said: "In *Holloway*, our Supreme Court departed from *Batson* to the extent that it held that an accused does not have to first make out a prima facie case to be entitled to an explanation from the state. The court in *Holloway* stated that rather than deciding, based on the existence of a prima facie case, whether an accused is entitled to an explanation of the prosecutor's use of peremptory challenges, the better course to follow would be to hold a *Batson* hearing on the defendant's request whenever the defendant is a member of a cognizable racial group and the prosecutor exercises peremptory challenges to remove members of the defendant's race from the venire." Id., 375. "A defendant who alleges that he has been the victim of purposeful racial discrimination in the use of a peremptory challenge carries the ultimate burden of persuasion. *Batson* v. *Kentucky*, supra, 476 U.S. 94 n.18." *State* v. *Thomas*, supra, 374–75.

---

[13] Once the burden has shifted to the state to advance a race neutral explanation for peremptorily challenging the potential juror, the defendant's *Batson* claim is treated similarly under the federal and state constitutions. See *State* v. *Hinton*, 227 Conn. 301, 322 n.23, 630 A.2d 593 (1993).

The defendant's claim on this issue is that "the trial court should have conducted a full hearing into the reasons for this exclusion [of Harris by the state]." The state contends that there was no need for a "full hearing" as it maintained that Harris was challenged because he was a social worker and also had an arrest record. It is significant to recognize that both of those reasons were generated by Harris' own testimony on his voir dire examination. Our Supreme Court has said: "We decline to ascribe a racial animus to the state's excusal of a venireperson with an arrest record simply because that venireperson was black. We agree with courts in other jurisdictions that this concern constitutes a neutral ground for the state's exercise of a peremptory challenge to excuse a black venireperson. See, e.g., *State* v. *Thompson*, 516 So. 2d 349, 354 (La. 1987), cert. denied, 488 U.S. 871, 109 S. Ct. 180, 102 L. Ed. 2d 149 (1988); *State* v. *Moore*, 438 N.W.2d 101, 107 (Minn. 1989)." *State* v. *Smith*, 222 Conn. 1, 14, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992). Courts have also held that "[a] person's employment or lack of employment may, in an appropriate case, constitute a legitimate race-neutral reason for exclusion (see, Colbert, *Challenging the Challenge: Thirteenth Amendment as a Prohibition Against the Racial Use of Peremptory Challenges*, 76 Cornell L. Rev. 1, 97–98 [1990]) . . . ." *People* v. *Duncan*, 177 App. Div. 2d 187, 194, 582 N.Y.S.2d 847 (1992). Peremptory challenges based on employment reasons have been upheld. Some courts have done so in cases involving social workers. See, e.g., *People* v. *Wint*, 237 App. Div. 2d 195, 197, 655 N.Y.S.2d 469 (1997) (sustaining challenge to venireperson who was social worker on assumption she might be unduly sympathetic to criminal defendant); *United States* v. *Alvarado*, 951 F.2d 22, 24–25 (2d Cir. 1991) (sustaining challenge where

venireperson was social worker); *United States* v. *Wallace*, 32 F.3d 921, 925 (5th Cir. 1994) (sustaining challenge because venireperson was social worker and recognizing that as race neutral reason and nonpretextual); *Williams* v. *State*, 507 N.E.2d 997, 999 (Ind. App. 1987) (sustaining challenge against venireperson who was counselor at family and children's center because she might take liberal view of sexual behavior, in instant rape case, and because of her employment as social worker).[14]

After the state had provided its race neutral reasons, the defendant did not challenge them nor did he thereafter address the court. Specifically, he never requested, as he now argues, a "full hearing." Moreover, we recognize that, once the state has articulated its racially neutral explanation, the defendant should have the opportunity to rebut with his own interpretation and to demonstrate whether those reasons are pretextual or insufficient. See *Batson* v. *Kentucky*, supra, 476 U.S. 98 n.21; *State* v. *Thomas*, supra, 50 Conn. App. 375; see also *United States* v. *Wilson*, 884 F.2d 1121, 1124 (8th Cir. 1989). At this point, we note that the defendant's brief states that "the court accepted the state's proffered neutral reasons and declined to allow defense counsel an opportunity to rebut them." An examination of the trial transcript discloses that after defense counsel asked "for *Batson* reasons," he never, thereafter, addressed the court, even though the court made its ruling immediately after the state proffered its "*Batson* reasons." The defendant said *nothing*; the trial court,

---

[14] In the *Batson* context, the Second Circuit has aptly noted: "An explanation for a particular challenge need not necessarily be pigeon-holed as wholly acceptable or wholly unacceptable. The relative plausibility or implausibility of each explanation for a particular challenge, assessed in light of the prosecution's acceptance of jurors with similar circumstances, may strengthen or weaken the assessment of the prosecution's explanation as to other challenges and thereby assist the fact-finder in determining overall intent." *United States* v. *Alvarado*, 923 F.2d 253, 256 (2d Cir. 1991).

however, did not "decline" him the opportunity as claimed. In any event, our courts have held, as to the opportunity aspect, that a defendant himself or through counsel may waive "part of the process intended to protect his equal protection right." *State* v. *Thomas*, supra, 50 Conn. App. 376; see *State* v. *Patterson*, 230 Conn. 385, 393, 645 A.2d 535 (1994), on appeal after remand, 236 Conn. 561, 674 A.2d 416 (1996). Under the circumstances, we conclude that such a waiver occurred.

In ruling as it did, the trial court considered the requisite circumstances. The proffered race neutral reasons each had a valid basis, supported by authorities, for sustaining the peremptory challenge to Harris and were neither pretextual nor insufficient. Its ruling is also entitled to "appropriate deference." *Batson* v. *Kentucky*, supra, 476 U.S. 98 n.21; *State* v. *Gonzalez*, supra, 206 Conn. 395. The defendant has not maintained his burden of proof on this issue and his claim must fail.

### III

The defendant next claims that the trial court improperly admitted evidence of two prior incidents of uncharged misconduct that involved threats by the defendant to shoot the victim.[15] The state offered this evidence on the issue of the defendant's intent and his motive. The defendant argued that this evidence was highly prejudicial and not probative. After a lengthy argument and an offer of proof, the trial court found that the probative value of the proffered evidence outweighed its prejudicial effect and admitted the evidence on the issue of intent and motive.

The factual background of the two incidents of uncharged misconduct admitted was as follows: The

---

[15] The state had sought the admission of five incidents of prior uncharged misconduct of which the trial court admitted only two.

first incident occurred on April 11, 1992.[16] On that date, Michael Chance and his girlfriend gave the defendant a ride to the victim's home on Tyler Street in New Haven. Upon arrival, the defendant exited the car. An argument ensued in front of the victim's house as the defendant started arguing with Barker. Upon hearing the argument, the victim came out of his house and began arguing with the defendant. The victim's father intervened before there was any physical contact between the victim and the defendant. As the defendant was leaving, he said to the victim: "I'm going to get mine." The victim understood that to mean that the defendant was going to get a "[w]eapon to come back . . . to get me."[17] The defendant left with his friends who, at his request, drove him to his home on Winthrop Avenue. In the meantime, the victim's mother called the police. The victim and Barker told Peter A. Beck-

---

[16] Evidence of the April 11, 1992 incident was presented through the victim, New Haven police officer Peter A. Beckwith and Michael Chance, a friend of the defendant.

[17] During his direct examination, the victim testified as follows:

"Q. Okay. Now, at this time did Ivan make any comments to you?

"A. Yes, he was leaving. He was saying exact words, I'm going to get mine. I'm going to get mine.

"Q. Okay. And then what happened after he said that?

"A. After he said that he left and the cops came.

"Q. Cops came?

"A. We explained what had happened.

"Q. And let me ask you this, you explained what happened to the cops just what you told us now?

"A. Yeah.

"Q. Did you explain to the officer what your impression was of what Ivan meant by saying, I got to get mine?

"A. Yes, in other words . . .

"A. He meant he was going to come back to get me. That's what he meant by, I'm going to get mine. I'm going to come back and get the mine.

"Q. Get mine, what did he mean get something?

"A. Yes, he was going to get—get a pistol or whatever.

"Q. You mention that—

"A. Weapon to come back, you know, to get me.

"Q. You tell that to the officer?

"A. I told that to the officer. That's the officer leaving my house."

with, the police officer who had responded, of the defendant's threat. Beckwith, believing that the defendant might return with a gun, positioned his cruiser at the end of Tyler Street with the lights off.[18] In the meantime, the defendant returned to his home on Winthrop Avenue and obtained a sawed-off shotgun. The defendant returned to Tyler Street in the backseat of his friend's car. Beckwith ordered the car to pull over and he obtained the consent of the owner and operator of the car to search it. In the back, where the defendant had been seated, he found a twelve gauge sawed-off shotgun. He also found one live twelve gauge shotgun shell on the defendant's person. Beckwith arrested the defendant for possession of the shotgun.[19]

The second incident of prior misconduct admitted by the trial court took place about two or three months before the victim was shot by the defendant on August 1, 1993. On that occasion, the victim had driven Barker and her daughter Emily to the Cepeda home on Winthrop Avenue to drop Emily off to visit her grandmother, the defendant's mother. The defendant grabbed Barker and then the victim got out of his car and he and the defendant were about to fight when the defendant told his younger brother David to go into the house and "get his steel." Barker went back into the victim's car with Emily. David came back out of the house with a nickel-plated .22 or .25 caliber handgun. The defendant pointed the gun at the victim and said, "What are you going to do now?" When a neighbor threatened to call the police, the defendant went into his house and the victim drove away in his car.

---

[18] Beckwith had learned upon his arrival at the Torres' house on Tyler Street that the defendant had left in his friend's car, which was described to him as a Nissan hatchback, the rear window of which was missing with clear plastic in its place.

[19] The shotgun was an illegal (pump) shotgun meaning that it was shorter than the legal minimum of eighteen inches. The defendant, later and prior to trial, pleaded guilty to possessing an illegal sawed-off shotgun.

"It is well settled that evidence of prior misconduct is admissible for the limited purposes of showing intent, an element in the crime, identity, malice, motive or a system of criminal design." *State* v. *Taylor*, 239 Conn. 481, 501, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997); *State* v. *Figueroa*, 235 Conn. 145, 161–62, 665 A.2d 63 (1995); *State* v. *Kulmac*, 230 Conn. 43, 60–61, 644 A.2d 887 (1994); *State* v. *Wild*, 43 Conn. App. 458, 463, 684 A.2d 720, cert. denied, 239 Conn. 954, 688 A.2d 326 (1996). The test is two-pronged. "First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. . . . Second, the probative value of such evidence must outweigh the prejudicial effect . . . ." *State* v. *Figueroa*, supra, 162; *State* v. *Kulmac*, supra, 61. "The primary responsibility for conducting the prejudicial-probative balancing test rests with the trial court, and its conclusion will be disturbed only for a manifest abuse of discretion." *State* v. *Figueroa*, supra, 162; *State* v. *Henry*, 41 Conn. App. 169, 177, 674 A.2d 862 (1996); *State* v. *Larkin*, 38 Conn. App. 125, 132, 659 A.2d 1211, cert. denied, 235 Conn. 903, 665 A.2d 904 (1995). "We note that [b]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling. . . ." (Internal quotation marks omitted.) *State* v. *Zoravali*, 34 Conn. App. 428, 436, 641 A.2d 796, cert. denied, 230 Conn. 906, 644 A.2d 921 (1994); *State* v. *Madore*, 45 Conn. App. 512, 520, 696 A.2d 1293 (1997); see also *State* v. *Figueroa*, supra, 162; *State* v. *Wild*, supra, 463. Evidence of prior threats by a defendant directed to his victim has been held relevant to the issues of intent and motive. See, e.g., *State* v. *Veal*, 201 Conn. 368, 375, 517 A.2d 615 (1986); *State* v. *Falby*, 187 Conn. 6, 23, 444 A.2d 213 (1982).

The evidence of the two incidents of prior misconduct admitted was clearly relevant to the issues of intent

and motive that were central issues in this case. The two incidents also were reasonably similar to the factual allegations surrounding the August 1, 1993 shooting, including that both showed the defendant's animus toward the victim for taking away Barker as his girlfriend. In determining which of the proffered prior misconduct evidence it might admit, the trial court, before doing so, conducted a lengthy hearing, listened to evidence of an offer of proof and explicated on what it deemed the applicable decisional law. The transcript demonstrates that once the trial court decided to admit the two incidents on the issues of intent and motive, it appreciated the delicate balancing test of probative value as against the prejudicial effect of such evidence. In addition, the trial court lessened the potential effect of such prejudice by repeatedly giving the jury limiting instructions that the evidence was to be considered only on the issues of motive and intent.[20] See *State* v. *Jones*, 205 Conn. 638, 663, 534 A.2d 1199 (1987); *State* v. *Wild*, supra, 43 Conn. App. 463.

The defendant, however, claims that the trial court abused its discretion in admitting the evidence of the sawed-off shotgun and the nickel-plated pistol evidence "because the instrumentalities used in these offenses . . . were not the same as the small black handgun used in the [August 1, 1993] assault" of which he stood accused. He asserts that our courts have held that evidence of prior misconduct "not using the same instrumentality or method" is inadmissible under the general exception to the general rule against allowing the evidence. In support of his position, he cites *State* v. *Coleman*, 35 Conn. App. 279, 282, 646 A.2d 213, cert. denied, 231 Conn. 928, 648 A.2d 879 (1994), and *State* v. *Weber*,

---

[20] The trial court did this on at least four occasions. It did so at the time each witness testified about these two incidents. These witnesses were the victim, Barker and Chance. It also did so at the time of its final instructions to the jury.

31 Conn. App. 58, 66, 623 A.2d 506, cert denied, 226 Conn. 908, 625 A.2d 1379 (1993). The state disagrees and argues that these cases are distinguishable and do not support the defendant's claim. We agree with the state.

In *Coleman*, the defendant was charged with burglary in the first degree, assault in the first degree and attempted robbery in the first degree as the result of an early morning break-in of the victim's apartment. The victim was awakened by the touch of a knife on her throat wielded by the defendant. In the ensuing struggle, she sustained several lacerations. About two weeks later, the police seized three knives from the defendant's car, pursuant to a search warrant. At the trial, the state offered the knives to show that because the defendant possessed the knives, he possessed the means of committing the crimes charged. See *State* v. *Coleman*, supra, 35 Conn. App. 286. This court found that the knives were improperly admitted because the state had failed to establish a nexus between those knives and the crime charged. Id., 287. *Coleman* involved a different issue than that present in this case. Here, the state did not offer the challenged evidence of prior threats to show that the defendant earlier possessed a weapon that may have been used by him when he shot the victim on August 1, 1993. Rather, that evidence was offered for a limited purpose on the issue of the defendant's motive vis-a-vis his shooting of the victim. *Coleman* does not avail the defendant.

In *Weber*, the defendant was charged with assault in the second degree as a lesser included offense of assault in the first degree. After the state completed the presentation of its case-in-chief, the defendant made an offer of proof as to ten separate acts involving Mason, the other party involved, to determine whether any of Mason's convictions or acts of prior misconduct involving violence would be admissible, on the issue of initial aggressor, in connection with the defendant's claim of

self-defense. The trial court excluded all but three of these acts. It permitted the defendant to use the three acts as evidence of three unnamed felony convictions for impeachment purposes. We ruled in *Weber*, however, that the trial court had not abused its discretion in precluding the state from inquiring into the underlying acts of these three convictions.

In the present case, the state did not ask for the admission of the prior threats to impeach the defendant's credibility, but only on the limited issue of motive and intent. Unlike the defendant in *Weber* who testified, the defendant in this case did not, and so there was no real opportunity for the state to directly attack his credibility. *Weber* does not, under the circumstances, support the defendant.

We must reject the defendant's claim on the admitted prior misconduct evidence. The trial court properly decided that the evidence of prior threats was relevant to the issues of motive and intent and it reasonably could have concluded that the probative value of such evidence outweighed its prejudicial tendency. Accordingly, the trial court did not abuse its discretion in admitting that evidence.

IV

Next, the defendant claims that the trial court improperly denied his motion[21] to order the state to produce notes taken by the prosecutor during an interview with the state's witness, Joel Coban. The defendant argues that the notes fall within the definition of "statement"

---

[21] At the time defense counsel stated his motion as follows: "I would ask for production of those notes, Your Honor, under Connecticut version of the Jencks Act as a statement of the witness which was made to call him, a law enforcement-type personnel, prosecutorial arm of the law enforcement, taken was based upon his testimony which were subscribed as he said it and read back to him. He adopted them as true and a correct statement, as being a complete statement, of what he had to say with no omissions and no additional—and under those facts I would ask that it be produced."

contained in Practice Book § 40-15, formerly § 749,[22] and that he was entitled to production of the notes pursuant to General Statutes § 54-86b.[23] The state objected arguing that the notes belonged to the state, that they did not constitute a "statement" under law or the rules of practice, that the state did not show them to the witness and that the state did not read them back to the witness in a narrative form and that the witness did not adopt them. Essentially, the state's position was that the notes were not a "statement" of the witness. Thereafter, the trial court examined these notes in camera and then questioned Coban concerning the notes.[24]

---

[22] Practice Book § 40-15, formerly § 749, provides: "The term 'statement' as used in Sections 40-11, 40-13 and 40-26 means:

"(1) A written statement made by a person and signed or otherwise adopted or approved by such person; or

"(2) A stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by a person and recorded contemporaneously with the making of such oral statement." It is apparent that Practice Book § 40-15 (2) is not involved in this issue.

[23] General Statutes § 54-86b (a) provides: "In any criminal prosecution, after a witness called by the prosecution has testified on direct examination, the court shall on motion of the defendant order the prosecution to produce any statement oral or written of the witness in the possession of the prosecution which relates to the subject matter as to which the witness has testified, and the court shall order said statement to be delivered directly to the defendant for his examination and use."

[24] At that time the following colloquy took place:

"The Court: Do you recall yesterday telling us that, as you told him things, he was writing them down?

"[The Witness]: Not everything. He would just ask me questions.

"The Court: All right. But he was writing—he was writing something during the course of asking questions . . .

"[The Witness]: Yes.

"The Court:—is that correct? All right. Did he ever show you what he had written down?

"[The Witness]: No.

"The Court: So you never saw anything that he had put down on that piece of paper?

"[The Witness]: No.

"The Court: All right. There was some testimony from you yesterday about whether or not he read back the things he was writing down to you; do you recall that?

On the basis of Coban's testimony about the notes and the notes themselves, the trial court concluded that the notes did not constitute a "statement" because there was insufficient evidence that the witness ratified or adopted the notes, and that the "context of the notes themselves are not conducive to a read back adoption based on the use of isolated words, incomplete sentences, partial sentences and [the notes] also contain a diagram which was never discussed in the testimony of the witnesses, nor asked about." The defendant now argues that the notes were a "statement" because the state read back to Coban the notes it had taken "to see if they were correct"[25] and that Coban adopted and ratified them.

"The trial court has broad discretion in determining what constitutes a statement that must be disclosed, and its findings will be disturbed only if they are clearly erroneous. See *State* v. *Wityak*, 29 Conn. App. 455, 462, 616 A.2d 276 (1992), aff'd, 226 Conn. 470, 627 A.2d 1341 (1993); *State* v. *Black*, 23 Conn. App. 241, 244, 579 A.2d 1107, cert. denied, 216 Conn. 827, 582 A.2d 204 (1990)." *State* v. *Milner*, 46 Conn. App. 118, 127–28, 699 A.2d 1022 (1997).

"Practice Book § 749 [now § 40-15] limits the disclosures governed by §§ 748 through 755 to two categories

"[The Witness]: Yes.

"The Court: All right.

"[The Witness]: Wasn't everything.

"The Court: What do you mean by that?

"[The Witness]: He asked me like how far were you, or where the hole was in the fence, and the distance.

"The Court: All right. Was he asking you questions about what you had said, or was he actually reading what he had written down to you?

"[The Witness]: He was asking me what I said.

"The Court: All right. I have no further questions."

[25] In the trial court's ruling denying the defendant's motion for production of the state's notes, the trial court also said: "To make the record clear, I don't think there has been a sufficient showing of adoption in part based on the witness' testimony *which I find credible* on that score." (Emphasis added.)

of materials: '(1) A written statement made by a person and signed or otherwise adopted or approved by him; or (2) A stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by a person and recorded contemporaneously with the making of such oral statement.' " *State* v. *Myers*, 193 Conn. 457, 470, 479 A.2d 199 (1984); see also *State* v. *Monteeth*, 208 Conn. 202, 216, 544 A.2d 1199 (1988); *State* v. *Wityak*, supra, 29 Conn. App. 461.

The trial court's conclusion that the prosecutor's notes were not a "statement" within the meaning of § 749, now § 40-15, and therefore not subject to disclosure, was not clearly erroneous. During voir dire, Coban testified that the prosecutor did not read back "everything" that he had written down. The trial court inquired about Coban's use of the word "everything" and asked whether the prosecutor was asking him questions about what the witness had said or was "he actually reading what he had written down to you?" The witness replied: "He was asking me what I said." It is fair to say that adoption or approval can be shown by demonstrating that the interviewer read back to the witness what he wrote and that the witness affirmatively stated his approval. *United States* v. *Allen*, 798 F.2d 985, 996 (7th Cir. 1986). It should be noted, however, "[a] general affirmation by a witness that the interviewer's notes capture the basic gist of their conversation, in the absence of a showing that the witness read or was read what the interviewer has written, does not constitute adoption or approval of the notes. See *Goldberg* v. *United States*, 425 U.S. 94, 110–11 n.19, 96 S. Ct. 1338, 47 L. Ed. 2d 603 (1976) (construing the nearly identical provisions of the Jencks Act, 18 U.S.C. § 3500)." *State* v. *Black*, 23 Conn. App. 241, 245, 579 A.2d 1107, cert. denied, 216 Conn. 827, 582 A.2d 204 (1990). We note that the definition of "statement" found in our rules of

practice was modeled after the definition set out in the federal Jencks Act, 18 U.S.C. § 3500. See *State* v. *Wityak*, supra, 29 Conn. App. 463. Keeping in mind that the reason the Jencks Act requires the witness to sign or otherwise approve the statement involved is that the witness may be impeached by this evidence. If the witness has not expressly approved the statement, it clearly would be unfair to use such evidence to impeach him. *United States* v. *O'Malley*, 796 F.2d 891, 900 (7th Cir. 1986). Such an approval serves to attain the utmost fairness to a criminal defendant. The defendant's claim here must fail.

## V

Finally, the defendant claims that the trial court should not have allowed the rebuttal testimony of Joseph Lawlor, a state inspector, because it did not contradict the testimony of the eyewitness John Pelletier. The state claims that this is not supported by the record. We agree with the state.

This issue requires setting out certain additional facts. Pelletier lived at 65 Winthrop Avenue, next door to the Cepedas. He testified that late in the afternoon of August 1, 1993, he was outside his house and witnessed the victim, whom Pelletier knew, arguing and then fighting with someone behind the victim's car. He saw a male go in and come out of the Cepeda house. After the fighting had stopped, Pelletier saw this male point a gun and shoot three or four times into the victim's car. He said that he did not know this male but did see that he had a "larger like Afro hair style." Pelletier also said on direct examination that as the shots were fired, he went behind a "little wall and I kept still looking." He was "looking at the gentleman with the gun" when he heard the first shot fired.

During cross examination of this witness, the following colloquy took place:

"[The Prosecutor]: Now, isn't it true that you told me when I was at your house with Inspector Lawlor that you didn't see anybody shoot a gun, and as soon as you heard the gun fire you went and hid behind the porto-let. Isn't that what you told me when I was at your house?

"[The Witness]: No.

"[The Prosecutor]: That's not what you told me?

"[Defense Counsel]: Objection, Your Honor. Let him finish the answer.

"The Court: Let him finish the question. . . . [Y]ou asked—asked if he told—

"[The Prosecutor]: Calls for yes or no.

"The Court: Have the court reporter read the question back. You can answer that question yes or no.

"[Last question read back.]

"[The Prosecutor]: So that's not what you told me?

"[The Witness]: No, it was not."

Thereafter, on rebuttal, Lawlor testified that on February 28, 1996, he had accompanied the prosecutor to the Pelletier home on Winthrop Avenue. At that time, Lawlor testified that Pelletier was asked whether "he had seen anything in respect to the [August 1, 1993 incident]?" The inspector testified that "[Pelletier] said, no, he didn't. When he heard shots he took shelter behind a house there." Pelletier was then asked if he was "sure about that" and he replied that "he was quite sure."

On appeal, the defendant argues that the trial court abused its discretion in allowing Lawlor's rebuttal testimony "because Pelletier did in fact testify that he did not see the shooter." The defendant further argues that Pelletier testified that "he saw a dark skinned Hispanic

male go into the house and get a gun and that he heard shots, but he did not testify that he saw this man actually shoot the gun." Therefore, he claims that because Lawlor's testimony did not contradict Pelletier's testimony, the trial court should not have allowed the rebuttal testimony.

"[R]ebuttal evidence is that which refutes the evidence presented by the defense, rather than that which merely bolsters the state's case . . . . *State* v. *Williamson*, 206 Conn. 685, 698, 539 A.2d 561 (1988); *State* v. *Lisella*, 187 Conn. 335, 337, 445 A.2d 922 (1982); *State* v. *Young*, 29 Conn. App. 754, 763, 618 A.2d 65 (1992), cert. denied, 225 Conn. 904, 621 A.2d 287 (1993); *State* v. *Maxwell*, 29 Conn. App. 704, 715, 618 A.2d 43 (1992), cert. denied, 225 Conn. 904, 621 A.2d 287, cert. denied, 509 U.S. 930, 113 S. Ct. 3057, 125 L. Ed. 2d 740 (1993). Rebuttal evidence is usually confined to testimony which is directed at refuting the evidence given by the defendant . . . or is in general contradiction of the testimony given by the defendant . . . . The admission of rebuttal evidence is ordinarily within the sound discretion of the trial court. . . . *State* v. *Canty*, 223 Conn. 703, 715–16, 613 A.2d 1287 (1992); see also *State* v. *Williamson*, supra, 697–98. A trial court is vested with broad discretion in determining the relevance and admissibility of evidence. *State* v. *Bunkley*, 202 Conn. 629, 648–49, 522 A.2d 795 (1987). Further, every reasonable presumption will be given in favor of upholding the court's ruling when ascertaining if the ruling amounted to an abuse of discretion. *State* v. *Colon*, 28 Conn. App. 231, 236, 611 A.2d 902, cert. denied, 223 Conn. 922, 614 A.2d 827 (1992)." (Internal quotation marks omitted.) *State* v. *Cavell*, 34 Conn. App. 276, 281–82, 641 A.2d 426 (1994), aff'd, 235 Conn. 711, 670 A.2d 261 (1996). "When a defendant offers evidence in his defense, it is appropriate for the state to offer evidence to refute it, if possible." *State* v. *Cavell*, 235 Conn. 711, 727, 670 A.2d 261 (1996); see also *State* v. *William-*

*son*, supra, 698; *State* v. *Crowe*, 174 Conn. 129, 132, 384 A.2d 340 (1977). "Testimony that refutes evidence or impeaches a witness' credibility is proper during rebuttal . . . ." *State* v. *Rochette*, 25 Conn. App. 298, 303, 594 A.2d 1006, cert. denied, 220 Conn. 912, 597 A.2d 337 (1991), cert. denied, 502 U.S. 1045, 112 S. Ct. 905, 116 L. Ed. 2d 806 (1992). The trial court did not abuse its discretion in admitting the rebuttal evidence; the record supports the trial court's ruling.

The judgment is affirmed.

In this opinion the other judges concurred.