[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION DEFENDANT'S POSTTRIAL MOTIONS
In this case, the plaintiff, Leslie Craine, age 56, recovered a verdict in the amount of $12,671,304 against her former employer, the defendant, Trinity College, on January 14, 1999. The jury returned a plaintiffs verdict as to the first (breach of contract), third (gender discrimination), fourth (negligent CT Page 16840 misrepresentation) and fifth (negligent infliction of emotional distress) counts of the plaintiffs amended complaint and a defendant's verdict as to the second count (age discrimination). The defendant timely moved pursuant to Practice Book § 16-37 for judgment notwithstanding the verdict in accordance with its motion for directed verdict, and, in the alternative, moved pursuant to Practice Book § 16-35, (1) to set aside the verdict on the plaintiff's claims for punitive damages, emotional distress damages due to negligent misrepresentation and damages for increased tax liability; (2) for a statutory reduction of the award for emotional distress and punitive damages under Title VII on the basis that such damages are subject to the statutory cap; (3) for a remittitur on the grounds that the award for emotional distress and punitive damages is duplicative, excessive and against the weight of the evidence, and the award of future damages is speculative; and (4) for a new trial on the grounds that the court (a) erroneously instructed the jury, (b) gave the jury verdict forms and special interrogatories that prejudiced the defendant, (c) made erroneous evidentiary rulings, (d) failed to give curative instructions regarding improper closing argument of the plaintiff's counsel, and (e) made prejudicial comments and erred in rulings, the cumulative effect of which warrants a new trial. After receiving several memoranda of law and hearing oral argument on three separate occasions, the court denied the motion for judgment notwithstanding the verdict as to counts one, three and four and granted it as to count five; denied the motion to set aside the verdict; granted the motion for statutory reduction in part and denied it in part; granted the motion for remittitur in part and denied it in part; and, denied the motion for new trial. The statutory reduction and the remittitur reduced the total verdict to $3,021,304.00.[1] What follows is an articulation of the court's ruling on the defendant's various motions.
 I. MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT
"[A] motion [for judgment notwithstanding the verdict] should be granted if the evidence establishes, as a matter of law, that the party who had obtained the verdict could not and was not entitled to prevail. Gesualdi v. Connecticut Co., 131 Conn. 622,627 [41 A.2d 771 (1945)]; Yeske v. Avon Old Farms School,1 Conn. App. 195, 206 [470 A.2d 705 (1984)]. When considering the motion, the evidence must be given the most favorable construction in CT Page 16841 support of the verdict as is reasonably possible. Aksomitas v.Aksomitas, 205 Conn. 93, 100 [529 A.2d 1314 (1987)]. When a verdict is challenged because of a lack of sufficient evidence, the issue raised is whether the trier of fact could reasonably have concluded, upon facts established and inferences permissibly drawn from them, that the cumulative effect of the evidence warranted the ultimate finding made. Coelho v. Posi-SealInternational, Inc., 208 Conn. 106, 112 [544 A.2d 170 (1988)];Jonap v. Silver, 1 Conn. App. 550, 559 [474 A.2d 800 (1984)]."Foley v. The Huntington Co., Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 246145 (March 18, 1994,Fuller, J). "While it is the jury's right to draw logical deductions and make reasonable inferences from the facts proven . . . it may not resort to mere conjecture and speculation. . . . If the evidence would not reasonably support a finding of the particular issue, the trial court has a duty not to submit it to the jury." (Internal quotation marks omitted.)Sandella v. Dick Corp. , 53 Conn. App. 213, 218-19, 729 A.2d 813, cert. denied, 249 Conn. 926, ___ A.2d ___ (1999).
A. Count One (Breach of Contract)
The plaintiff and defendant agreed at trial that the plaintiff had an express contract of employment with the defendant for a six-year tenure track faculty position the terms of which were governed by the faculty manual. The plaintiff claimed at trial that the defendant breached the contract in two ways: 1) by failing to follow the procedures set forth in the faculty manual; and, 2) by failing to follow its affirmative action policy. The defendant argues that the plaintiff failed to establish that it breached a contract of employment, and therefore it is entitled to judgment notwithstanding the verdict on the first count of the plaintiff's complaint. The defendant advances two grounds in support of this argument. First, the defendant asserts that the court improperly failed to instruct the jury that the plaintiff was required to prove by a preponderance of the evidence that the defendant breached the contract in an arbitrary, capricious or bad faith manner, which could be demonstrated only if there was no discernable rational basis for the defendant's Appointments Promotions Committee's (A P Committee) decision. Because an improper jury instruction is not a proper ground for a judgment notwithstanding the verdict, the defendant's motion on this basis as to count one is without merit. See Gesualdi v. Connecticut Co., supra,131 Conn. 627. CT Page 16842
The defendant next asserts that there was insufficient evidence at trial demonstrating that it failed to follow procedures as outlined in the faculty manual, and that the evidence demonstrated that the defendant took all appropriate steps to consider the plaintiff's teaching, scholarship and service in accordance with the terms of the faculty manual in assessing her for tenure. The plaintiff argues that she sufficiently established a breach of contract and that, based on the evidence presented at trial, the jury could have reasonably found that the defendant failed to follow its own procedures set forth in the faculty manual. The defendant's focus is misdirected. The plaintiff's claim at trial was that the A P Committee breached the employment contract by failing to base its decision against tenure on the plaintiff's "failure to meet the standards of improvement derived from expectations for rank and specified in the last letter of reappointment" as provided in the faculty manual. See Exhibit 2, 1993 Trinity College Faculty Manual, p. 12-14. Her claim was not that the defendant improperly exercised its academic judgment in assessing her credentials for tenure as the defendant so frequently claimed during trial.
According to the evidence adduced at trial, the last letter of reappointment directed the plaintiff to "devote her scholarly energies to original research projects and, specifically, to the publication of the results of research conducted in her laboratory at Trinity." Exhibit 26, Letter from Jan Cohn, Secretary of A P Committee, to David Henderson, Chairman of the Department of Chemistry, dated May 7, 1991. However, the decision to deny the plaintiff tenure as articulated by the A P Committee was based on the fact that she had not published in asufficient quantity from research conducted in her laboratory. See Exhibit 46, Letter from Jan Cohn, Secretary of A P Committee, to David Henderson, Chairman of the Department of Chemistry, dated March 31, 1993, p. 2 ("At the time of her review for second reappointment, the [A P] Committee wrote that it was important for Professor Craine to publish work that came out of her laboratory at Trinity. However, by the time of her tenure review, Professor Craine has only one published article in a refereed professional journal."). Giving this evidence the most favorable construction in support of the verdict as is reasonably possible, the court concludes that the trier of fact could reasonably have concluded that the defendant breached the employment contract by falling to follow the terms of the faculty manual, which requires the Committee, at the time of the second CT Page 16843 reappointment, to pay "particular attention" to the "candidate's prospects for tenure" and to "indicate as clearly as possible those areas to which a candidate needs to address special attention before the next scheduled review"; Exhibit 2, 1993 Trinity College Faculty Manual, p. 12-14; and which specifies that "a negative decision must be based on failure to meet the standards of improvement derived from expectations for rank and specified in the last letter of reappointment." Id., p. 12-14. Upon the facts established and inferences drawn therefrom, the jury reasonably could have concluded that because the letter denying the plaintiff tenure did not base its denial upon a failure of the plaintiff to devote her scholarly energies to original research projects or, more specifically, to the publication of the results of research conducted in her laboratory, the defendant used a standard of improvement to evaluate the plaintiff's eligibility for tenure that was not specified in the last letter of reappointment, in violation of the express terms of the faculty manual.
The defendant also argues that the plaintiff failed to present any evidence that she was entitled to special consideration under the affirmative action policy outlined in the faculty manual. Although the court has already determined that there was a sufficient basis upon which the trier of fact could reasonably have concluded as it did on count one, since there was a separate interrogatory on this issue to which the jury responded in the affirmative,[2] the court also addresses the defendant's argument with respect to the plaintiff's second claim under count one. The affirmative action policy at issue provides, in pertinent part: "The College must make additional efforts to recruit, employ and promote qualified members of groups formerly excluded and presently under-utilized, even if that exclusion or under-utilization cannot be traced to particular discriminatory actions on the part of the College. The principle of Affirmative Action shall be given weight in the review process by departments, the Appointments and Promotions Committee, and the Appointment and Promotions Appeals Board (if relevant) in two ways: (1) dimensions of assessment peculiar to a minority or female candidate, such as service on search committees, student advising, student recruitment activities, and appropriate public relations activities must not be neglected; (2) the candidate's scholarly activities, particularly when these are in new or non-traditional fields, must receive a fair and unbiased review." Exhibit 2, pp. B.2-1 to B.2-2. CT Page 16844
The defendant argues that there is no evidence that the plaintiff had undue burdens placed on her or that chemistry is a new or non-traditional field. In addition, the defendant argues that the uncontradicted testimony of the Affirmative Action Officer of Trinity affirmed that there was no basis for special consideration in the plaintiff's case. Therefore, according to the defendant, there was no reason to apply the affirmative action policy. In response, the plaintiff maintains that the testimony of the plaintiff's witnesses (adduced in her case in chief), indicated that the affirmative action policy language could apply to the Department of Chemistry at Trinity in which women were under-utilized and that chemistry was a non-traditional field for women. Therefore, according to the plaintiff, viewing the evidence in a light most favorable to sustaining the verdict, the trier of fact could reasonably have concluded as it did.
The court agrees with the plaintiff that it was within the province of the jury to determine whether the affirmative action policy applied to the plaintiff and, giving the evidence the most favorable construction in support of the verdict, the jury could reasonably have concluded, upon facts established and inferences permissibly drawn from them, there was sufficient evidence demonstrating that the affirmative action policy applied to the plaintiff and the defendant violated the policy. Accordingly, the defendant's motion for judgment notwithstanding the verdict as to count one is denied.
B. Count Three (Gender Discrimination)
The defendant argues that the jury could not reasonably, logically or legally have concluded that the defendant discriminated against her based on gender because the plaintiff failed to present evidence that the defendant considered her gender as a factor in its decision to deny her tenure and, therefore, it is entitled to judgment notwithstanding the verdict on the third count of the plaintiff's complaint. The defendant asserts that the fact that Jack Chatfield, a member of the history department, was granted tenure in the same year that the plaintiff was denied tenure does not demonstrate sex discrimination because there exists no causal connection between the two decisions. The defendant points to its own record of granting tenure to two females, Paula Russo and Maureen Pine, and denying tenure to a male, John Gillroy, in the same year as it denied the plaintiff tenure. CT Page 16845
The plaintiff argues that there was sufficient evidence for the jury to conclude that the defendant based its decision to deny her tenure on her gender. According to the plaintiff, the evidence showed that the defendant inconsistently applied the procedure outlined in the faculty manual when comparing the plaintiff's tenure decision with that of Chatfield by treating Chatfield in a more lenient fashion and by giving the plaintiff's tenure file a more "critical reading." The plaintiff argues that evidence of this inconsistency, combined with evidence that one of the members of the A P Committee who engaged in the "critical reading" of the plaintiff's file referred to one of her publications as a "collection of cookie recipes," and the mendacity exhibited by the defendant for denying the plaintiff tenure in its reasons put forth at trial, sufficiently establishes an evidentiary basis upon which the jury could infer that discrimination on the basis of sex was a determinative factor in denying her tenure. The court agrees with the plaintiff.
The fact that the defendant can point to testimony of members of the A P Committee denying gender discrimination and other evidence that it claims tends to show that the defendant did not act on the basis of gender does not necessarily indicate that the plaintiff's tenure decision could not have been made on such a basis, especially where there exists other testimony and evidence that could be construed as demonstrating gender bias. Indeed, "[t]he sifting and weighing of evidence is peculiarly the function of the trier. [N]othing in our law is more elementary than that the trier is the final judge of the credibility of witnesses and of the weight to be accorded to their testimony. . . . The trier is free to accept or reject, in whole or in part, the testimony offered by either party." (Internal quotation marks omitted.) Smith Brook Farms, Inc. v. Wall,52 Conn. App. 34, 37, 725 A.2d 987 (1999). The jury had before it extensive evidence introduced by both the plaintiff and the defendant. It was the jury's function to consider the evidence and testimony, giving weight to that which it deemed credible and persuasive and discarding that which it deemed implausible and weak. In contrast to the defendant's evidence regarding the tenure decisions made in other people's cases in the same year as the plaintiff's, there was also evidence that tended to support a claim of gender discrimination. For example, there was evidence (both testimonial and in Defendant's Exhibits HHH-1 through 4), that Chatfield's credentials were not as impressive as the CT Page 16846 plaintiff's, as he had published no scholarly work, that all of the members of the plaintiff's department supported her for tenure, while Chatfield lacked such unanimous support as reflected in four letters from his colleagues in the history department which were included in his tenure file (Exhibit 86),[3] and that the plaintiff's outside reviewers were uniformly favorable which was not the case for Chatfield. The A 
P Committee insisted that the plaintiff had not published enough and yet excused Chatfield's lack of publication. At every opportunity, the defendant made reference to Chatfield's apparent charisma and popularity as a teacher and when reference was made by the plaintiff to the fact that both she and Chatfield were recipients of a junior faculty teaching award, the defendant would insist that teaching, service and scholarship are weighed equally in evaluating candidates for tenure and that the plaintiff's scholarship not her teaching was her downfall. Further, it was readily apparent from the cross-examination of the defendant's witnesses and his outside reviewer's letters that Chatfield's efforts at scholarship were largely unfinished, unpublished and predated his tenure review by a substantial margin. As one such reviewer stated, "[Chatfield's scholarship] shows great promise" (emphasis in original), a step clearly below the standard for tenure based on the faculty manual. The standards for each step of reappointment and tenure were repeated numerous times to the jury in the course of this twenty-seven day trial.[4] Further, the letter of August 10, 1993 (Exhibit 61), which affirmed the original denial of tenure after the plaintiff's appeal, suggested that the A P Committee applied an even more stringent standard of scholarship to the plaintiff than applies to tenure by its use of the word "maturity," a term which is derived from the standard set forth in the faculty manual pertaining to promotion to full professor.[5] The August 10, 1993 letter stated that the committee was not persuaded that "Professor Craine's scholarship had progressed beyond the stage of promise to one of maturity." Given the extensive critical analysis of the plaintiff's scholarship before the jury, all other factors being equal, e.g., age, teaching and service, the jury reasonably could have found that the plaintiff was treated differently than Chatfield because of her female gender.
The jury could have also found that the same level of hypercritical analysis of the outside reviewer letters that was applied to the plaintiff, as demonstrated by the exhaustive testimony by Professors Cohn and Brown, members of the A P Committee, was not applied to Chatfield as revealed by their CT Page 16847 cross-examination. In addition, the jury could have concluded that Brown's credibility was impeached and tainted due to his dismissive and deprecatory "cookie recipes" analogy in connection with the plaintiff's extensive revision of a laboratory manual and that his effort to justify his comments by testifying on redirect that he baked cookies at home further undermined his credibility. Moreover, as evidenced by its response to Interrogatory #11, the jury reasonably could have concluded that the plaintiff should have been given at least some benefit under the college's affirmative action policy due to her status as the only female in the history of the chemistry department and, in particular, as an organic chemist, which the testimony revealed was a non-traditional field for women and one in which women were unquestionably under-utilized.
Giving the evidence the most favorable construction in support of the verdict as is reasonably possible, as the court is required to do, the court concludes that the jury reasonably could have found, upon the facts established and any inferences drawn from them, "that the legitimate, nondiscriminatory reasons proffered by the [defendant] were false, and that more likely than not the [plaintiff's sex] was the real reason for" her denial of tenure. Woroski v. Nashua Corp. , 31 F.3d 105, 110 (2d Cir. 1994).
C. Count Four (Negligent Misrepresentation)
The defendant argues that the jury could not have reasonably, logically or legally concluded that the plaintiff presented sufficient evidence to support her claim of negligent misrepresentation and, therefore, it is entitled to judgment notwithstanding the verdict on the fourth count of the plaintiff's complaint. The plaintiff responds that the jury could have reasonably found that the failure of the second reappointment letter to include, "as clearly as possible," a quantitative standard that would be applied by the A P Committee at the time of the tenure decision constituted insufficient communication under the principles of § 552 of the Restatement (Second) of Torts. Specifically, the plaintiff points to evidence that the committee did not say in the second letter of reappointment that the plaintiff was required to publish a specific quantity, more than one, based on original research conducted in her laboratory, yet, the committee ultimately based its decision against tenure on the fact that the plaintiff had published only a single article based on research in her CT Page 16848 laboratory. In D'Ulisse Cupo v. Board of Directors of Notre DameHigh School, 202 Conn. 206, 217-18, 520 A.2d 217 (1987), the Supreme Court noted its longstanding recognition that even innocent misrepresentations of fact "may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth . . ." based on the principles set forth in § 552 of the Restatement (Second) of Torts.[6]
(Citations omitted.)
As to the plaintiff's claim of negligent misrepresentation, the court instructed the jury as follows:
In order to prevail in her claim of negligent misrepresentation, Leslie Craine must establish the following elements by a preponderance of the evidence: 1) that the defendant made representations of fact to her which it knew or should have known in the exercise of reasonable care to be false relating to the standards for tenure; 2) that it knew or should have known that she would be guided by or would rely on those representations in connection with her effort to obtain tenure; 3) that she justifiably relied on the information; and, 4) that she suffered a detriment or damages as a result of such reliance.
There was sufficient evidence that the last letter of reappointment directed the plaintiff to "devote her scholarly energies to original research projects and, specifically, to the publication of the results of research conducted in her laboratory at Trinity." Exhibit 26. The letter of denial of tenure indicated, however, that "by the time of her tenure review, Professor Craine has only one published article in a refereed professional journal." Exhibit 46. Based on these exhibits and the related testimony, the court finds that there was sufficient evidence that the defendant failed to exercise reasonable care in communicating to the plaintiff, "as clearly as possible," in the last letter of reappointment, the specific "standard of improvement" she had to meet to attain tenure. The jury further reasonably could have concluded that the plaintiff justifiably relied upon the standard set forth in the second letter of reappointment for her guidance in attaining tenure, and that, at the time of the tenure review, the A P Committee applied a more strict and quantitative standard to the tenure decision. Accordingly, the defendant's motion for judgment notwithstanding the verdict on count four is denied.
D. Count Five (Negligent Infliction of Emotional Distress). CT Page 16849
The defendant moves for judgment notwithstanding the verdict on count five on the basis that the jury could not have reasonably, logically or legally found the defendant liable for negligent infliction of emotional distress because the only evidence presented by the plaintiff at trial was that her denial of tenure caused her emotional distress which, as a matter of law, is insufficient to establish a claim for emotional distress in the employment context. See Defendant's Memorandum of Law, January 25, 1999, pp. 24-25, citing Parsons v. UnitedTechnologies Corp. , 243 Conn. 66, 88, 700 A.2d 655 (1997). The plaintiff does not dispute that evidence of the denial of tenure itself alone would be insufficient to demonstrate negligent infliction of emotional distress, but argues that the jury reasonably could have found that the way in which the plaintiff was denied tenure caused her emotional distress. based on "the manner in which the A P Committee denigrated her excellent teaching and the way in which it falsely described and diminished her scholarly record at Trinity College." Plaintiff's Objection, pp. 26-27.
In order to state a claim for negligent infliction of emotional distress, the plaintiff has the burden of pleading and proving that "the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that distress, if it were caused, might result in illness or bodily harm . . . Accordingly, negligent infliction of emotional distress in the employment context arises only where it is based upon unreasonable conduct of the defendant in the termination process. . . . The mere termination of employment, even where it is wrongful, is therefore not, by itself, enough to sustain a claim for negligent infliction of emotional distress. The mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior." (Citations omitted; internal quotation marks omitted.) Parsons v. UnitedTechnologies Corp. , supra, 243 Conn. 88-89.
The plaintiff argues that the A P Committee knew or should have known that the falsification of the plaintiff's credentials in the tenure denial letter was likely to cause her to suffer emotional distress. The plaintiff produced no evidence, however, demonstrating that the statements in question regarding the plaintiff's scholarship and teaching abilities were advanced as anything more than what the committee considered to be necessary to explain the reasons for any denial of tenure. While the denial CT Page 16850 of tenure itself may have been wrongful and the comments in support of the denial critically analyzing the plaintiff's credentials perhaps personally offensive to the plaintiff, there was no evidence that the manner of the plaintiff's denial of tenure was different in any way from the usual methods of denying tenure, or that it was done in any way that would cause anything more than the normal upset that would result from such denial. See Chieffalo v. Norden Systems, Inc., 49 Conn. App. 474, 480,714 A.2d 1261 (1998). Moreover, the plaintiff's own testimony and that of Dr. Lake, her treating psychologist, both demonstrated that the plaintiff's emotional distress was related to the loss of her career but not specifically to the statements made in the letters denying her tenure. Thus, construing all the evidence favorably in support of the verdict as is reasonably possible, the court finds that the plaintiff failed to prove by a preponderance of the evidence that the tenure denial letter, as opposed to the denial of tenure itself, caused her emotional distress. As there was insufficient evidence, as a matter of law, on the issue of causation, the defendant's motion for judgment notwithstanding the verdict on count five is granted.
 II. MOTION TO SET ASIDE THE VERDICT
The defendant has also moved, in the alternative, to set aside the verdict on the plaintiff's claims for punitive damages (count three), damages for emotional distress, for negligent misrepresentation (count four) and damages for increased tax liability (counts one and three).
A "verdict will be set aside and judgment directed only if [the court finds] that the jury could not reasonably and legally have reached their conclusion." (Internal quotation marks omitted.) Ham v. Greene, 248 Conn. 508, 519, 729 A.2d 740 (1999). "The trial court should not set a verdict aside where there was some evidence upon which the jury could reasonably have based its verdict, but should not refuse to set it aside where the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles. . . . Ultimately, [t]he decision to set aside a verdict entails the exercise of a broad legal discretion. . . . Limiting that discretion, however, is the litigants' constitutional right to have issues of fact determined by a jury where there is room for a reasonable difference of CT Page 16851 opinion among fair-minded jurors." (Internal quotation marks omitted.) Purzycki v. Fairfield, 244 Conn. 101, 106-07,708 A.2d 937 (1998). "In making the determination as to whether to set aside a verdict, `[t]he evidence must be given the most favorable construction in support of the verdict of which it is reasonably capable.'" Gaudio v. Griffin Health Services Corp. ,249 Conn. 523, 534, 733 A.2d 197 (1999), quoting Fink v. Golenbock,238 Conn. 183, 208, 680 A.2d 1243 (1996).
A. Punitive Damages Under Title VII (Count Three)
The defendant first argues that the verdict in favor of the plaintiff on her punitive damages claim under Title VII[7]
should be set aside because there was no evidence from which the jury could have reasonably, logically or legally found that the defendant discriminated against the plaintiff with actual malice or with reckless disregard to her federally protected rights. See42 U.S.C. § 1981a (b)(1). According to the defendant, "[m]erely granting tenure to Jack Chatfield cannot, as a matter of law, rationally support a finding of malice or reckless disregard of the law." Defendant's Memorandum, p. 28.
In order to be liable for punitive damages under Title VII, "[t]he employer must act with `malice or with reckless indifference to [the plaintiff's] federally protected rights.' § 1981a (b)(1) (emphasis added). The terms `malice' or `reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." Kolstad v. American Dental Assn., 527 U.S ___, 144 L.Ed.2d 494, 119 S.Ct. ___ (1999). Thus, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." Kolstad v. American Dental Assn., supra,144 L.Ed.2d 506.
The court finds that the jury could have reasonably concluded that the A P Committee was fully aware of what the law was and yet chose a course of action that discriminated against the plaintiff on the basis of her gender. Several members of the A 
P Committee boasted of their familiarity with the antidiscrimination laws and the affirmative action policy of Trinity College. In fact, one of the members of the Committee, Sharon Herzberger, was also the Affirmative Action Officer at Trinity. In light of the A P Committee's knowledge and understanding of the antidiscrimination laws, the jury reasonably CT Page 16852 could have found that the A P Committee acted "with actual malice or [with] reckless indifference to the federally protected rights of the plaintiff." (Defendant's Memorandum of Law, January 25, 1999, Exhibit C, Interrogatory #9.) "Egregiousness," is not a prerequisite to punitive damages. Kolstad v. American DentalAssn., supra, 144 L.Ed.2d 508. Therefore, the court holds that the plaintiff presented sufficient evidence for the jury to reasonably find that an award of punitive damages under Title VII was justified in this case.
B. Jury Instructions
The defendant also argues that the emotional distress damages due to negligent misrepresentation (count four) and the damages awarded for increased tax liability (counts one and three) should be set aside because the jury should not have been instructed that the plaintiff could be entitled to an award of those damages. "The inherent power of a trial court to set aside a verdict because of palpable and harmful error in its charge to the jury is well settled." Trainor v. Frank Mercede Sons, Inc.,152 Conn. 364, 366-67, 207 A.2d 54 (1964). However, "this must be done with great caution, and only if [the judge] is entirely satisfied, upon an authoritative or statutory basis, that he has committed unmistakable error that has caused unquestionable harm." Sciola v. Shernow, 22 Conn. App. 351, 360, 577 A.2d 1081, cert. denied, 216 Conn. 815, 580 A.2d 60 (1990).
1. Emotional Distress Damages for Negligent Misrepresentation (Count Four).[8]
The defendant argues that the emotional distress damages due to negligent misrepresentation should be set aside because "it is clear error to charge the jury that damages for emotional distress could be awarded for negligent misrepresentation" because such damages are limited to pecuniary losses. (Defendant's Memorandum of Law, January 25, 1999, p. 28, citingMunson v. United Technologies Corp. , 28 Conn. App. 184, 191,609 A.2d 1066 (1992).) Contrary to the defendant's argument, nothing in Munson suggests that damages for negligent infliction of emotional distress are limited to pecuniary losses; rather,Munson merely quotes from the Restatement, which includes a reference to pecuniary losses for negligent misrepresentation. See Munson v. United Technologies Corp. , supra.28 Conn. App. 191; see also Williams Ford, Inc. v. Hartford Courant Co.,232 Conn. 559, 575, 657 A.2d 212 (1995); D'Ulisse-Cupo v. Board ofCT Page 16853Directors of Notre Dame High School, supra, 202 Conn. 217-18; 3 Restatement (Second), Torts, § 552 (1977).
Moreover, in its charge the court instructed the jury consistently with Kilduff v. Adams, Inc., 219 Conn. 314,593 A.2d 478 (1991). In Kilduff, the Connecticut Supreme Court held that emotional distress damages for fraudulent misrepresentation were recoverable as consequential damages in a fraud action. The Court recognized that "[a]lthough several courts have denied recovery for mental distress in a fraud action on the ground that damages in such an action are solely intended to compensate the plaintiff for pecuniary loss . . . we concur with those jurisdictions that allow the recovery of emotional damages that are the natural and proximate result of fraud." (Citations omitted.) Id., 324.
"In Montinieri v. Southern New England Telephone Co., [175 Conn. 337, 345, 398 A.2d 1180 (1978)], we held that a plaintiff may recover for unintentional infliction of emotional distress even if the distress does not result in subsequent bodily injury and the plaintiff was not at risk of harm from physical impact. We limited such recovery, however, to cases where `the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm.' Id. . . . We conclude that the same standard should apply to plaintiff's seeking damages for unintentionally-caused emotional distress resulting from fraud." (Citations omitted.) Kilduff v. Adams,Inc., supra, 219 Conn. 325.
There exist no Connecticut appellate level cases that have addressed the issue of whether a plaintiff may recover damages for emotional distress associated with negligent misrepresentation. However, at least one unpublished Superior Court case has determined that a claimant can recover noneconomic damages for negligent misrepresentation. See Kesses v. Panache V,Inc., Superior Court, judicial district of New Haven at New Haven, Docket No. 373558 (June 18, 1997, Hodgson, J.) (19 Conn. L. Rptr. 636). The court in Kesses stated that "[t]he Restatement Second of Torts . . . suggests that the damages available for negligent misrepresentation are pecuniary losses. This court has not been able to locate any decision of the Connecticut Supreme Court concerning the scope of the damages available as to the tort. The closest that Court has come to considering the issue is its statement in Williams Ford, Inc. v. Hartford Courant Co.,232 Conn. 559, 579 [657 A.2d 212] (1995) that the remedy for CT Page 16854 negligent misrepresentation is independent of a remedy available on a contract claim." Kesses v. Panache V, Inc., supra,19 Conn. L. Rptr. 637.
In the present case, the court instructed the jury in pertinent part as follows: "[I]f you find that the plaintiff has proven that the defendant is liable for negligent misrepresentation, then you must determine the amount of noneconomic damages, if any, the plaintiff has proven by a preponderance of the evidence that she has sustained that was proximately caused by the defendant's negligent misrepresentation." Based on the reasoning of Kilduff, and the claims and evidence presented by the plaintiff, the foregoing instruction is consistent with "decisions allowing recovery for emotional harm in other contexts. . . ." Id., 325. (Citations omitted.)
2. Damages for Increased Tax Liability
Finally, the defendant argues that the court should set aside the damages award for increased tax liability because it is improper for the jury to consider any potential increased income tax liability. In support of its position, the defendant cites toGorham v. Farmington Motor Inn, Inc., 159 Conn. 576, 271 A.2d 94
(1970).
In the present case, based on the calculations and projections of Dr. Arthur Wright presented by way of testimony and exhibits, the jury awarded the plaintiff additional damages which they found to represent the present value of the plaintiff's increased income tax liability for back pay and future wages and fringe benefits awarded in connection with counts one (breach of contract), three (gender discrimination) and four (negligent misrepresentation). As distinguished from Gorham, the tax consequences were relevant to a determination of the damages rendered to the plaintiff. In Floyd v. FruitIndustries, Inc., 144 Conn. 659, 672-73, 136 A.2d 918 (1957), the Connecticut Supreme Court held that a defendant could present evidence concerning the probable income taxes in order to offset probable net earnings in assessing damages. Since Connecticut law permits consideration of the tax liability for damage awards to plaintiff's when relevant and the increased tax liability in this case was supported by expert testimony and analysis, which the jury reasonably could have found credible, the court refuses to set aside the verdict on this basis. CT Page 16855
 III. MOTION FOR STATUTORY REDUCTION
The defendant has moved, in the alternative, for a statutory reduction of the award for punitive and compensatory damages under Title VII (Count Three) on the basis that such damages are subject to a statutory cap. The plaintiff does not dispute that the amount of compensatory and punitive damages under federal law must be capped at $300,000, but argues that under state law, General Statutes § 46a-104, there is no such cap. In addition, the plaintiff argues that any recovery for front pay does not need to be capped under federal law.
The plaintiff's claim of gender discrimination, set forth in count three, was brought pursuant to both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981a, and the Connecticut Fair Employment Practices Act (CFEPA), General Statutes §46a-104. Title 42, § 1981a (b)(3) of the United States Code provides, in pertinent part: "The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed . . . (D) in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $300,000."42 U.S.C. § 1981a (b)(3)(D); see Hudson v. Rena, 130 F.3d 1193,1199-1201 (6th Cir. 1997), cert. denied, 142 S.Ct. 64,142 L.Ed.2d 50 (1998); Hogan v. Bangor Aroostook R.R. Co., 61 F.3d 1034,1037 (1st Cir. 1995). In contrast, General Statutes § 46a-104
provides: "The court may grant a complainant in an action brought in accordance with section 46a-100 such legal and equitable relief which it deems appropriate including, but not limited to, temporary or permanent injunctive relief, attorney's fees and court costs."
Since there is no question that the defendant had more than 500 employees during the applicable time frame, the compensatory and punitive damages awarded to the plaintiff under Title VII are subject to the $300,000 cap. The plaintiff argues, however, there is no concomitant cap under state law and that the Connecticut legislature intended the term `legal relief' found in § 46a-104
CT Page 16856 to include punitive as well as compensatory damages. Thus, the plaintiff claims the full $6 million awarded by the jury for punitive damages for gender discrimination.
While the court agrees with the plaintiff that there is no statutory cap on damages under General Statutes § 46a-104, the court rejects the plaintiff's contention that she is entitled to punitive damages under state law. General Statutes § 46a-104
contains no specific reference to punitive damages. SeePeckinpaugh v. Post-Newsweek Stations Connecticut, Inc., District Court, Docket No. 3475 (D. Conn. March 17, 1999) (since CFEPA does not expressly authorize punitive damages, the plaintiff may not recover under this theory). The court therefore grants the defendant's motion for a statutory reduction as to the $6 million jury award for punitive damages and reduces the amount of the award to the federal cap of $300,000.
The defendant also argues that the front pay awarded by the jury should also be subject to the federal statutory cap. Based upon the reasoning in Rivera v. Baccarat, Inc., 34 F. Sup.2d 870,877-78 (S.D.N.Y. 1999), the court holds that front pay in the amount of $344,990 awarded by the jury pursuant to Interrogatory #3 is not subject to the $300,000 cap on damage awards.
"The 1991 Civil Rights Act provides that "`compensatory damages . . . for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses' are subject to [the damage limitations of 42 U.S.C. § 1981a (b)(3)]. . . . The 1991 Act only excludes from the Act's damages caps back pay, interest on back pay, or any other type of relief authorized under 706(g) ofthe Civil Rights Act of 1964." (Citation omitted; emphasis in original.) Hudson v. Reno, supra, 130 F.3d 1203. Therefore, the court must determine whether front pay is encompassed within the "future pecuniary losses" capped by 42 U.S.C. § 1981a (b)(3), or uncapped as `any other equitable relief' that the court deems appropriate under 42 U.S.C. § 2000e-5 (g).
"`Front pay' is widely defined as the salary that an employee would have received had he or she not been subjected to unlawful discrimination of his employer, subject to the employee's mitigating his or her damages."[9] Hudson v. Reno, supra, 130 F.3d 1203. There is a split of authority in the federal courts concerning whether front pay is subject to the statutory cap on damages in 42 U.S.C. § 1981a. Compare Hudson v. Reno, supra, CT Page 16857 1202-04; Hamlin v. Charter Township of Flint, 965 F. Sup. 984, 987
(E.D. Mich. 1997); Kim v. Dial Service International, Inc., District Court, Docket No. 3327 (S.D.N.Y., August 11, 1997) (without analysis) (all holding that front pay is subject to cap); with Medlock v. Ortho BioTech, Inc., 164 F.3d 545 (10th Cir. 1999) (front pay constitutes `other equitable relief' not subject to cap; Kramer v. Logan County School District,157 F.3d 620 (8th Cir. 1998) (front pay is monetary equivalent of reinstatement and therefore not subject to cap); Rivera v.Baccarat, Inc., supra, 34 F. Sup.2d 877-78 (cap was meant for new remedies created by Civil Rights Act of 1991 not existing ones like back pay, interest on back pay and front pay).
The court adopts the reasoning of the Eighth and Tenth Circuits and Rivera v. Baccarat, Inc., supra, 34 F. Sup.2d 877
-78, and concludes that front pay is not subject to the statutory cap in 42 U.S.C. § 1981a. Further, the statutory language of General Statutes § 46a-104 places no limitation on an award of "legal and equitable relief which [the court] deems appropriate." Therefore, the court holds that neither front pay nor any other compensatory damages awarded to the plaintiff are subject to the federal statutory cap under state law.
Because punitive damages are available only under federal law subject to a statutory cap of $300,000, the motion for statutory reduction as to the punitive damage award is granted, and reduced from $6 million to $300,000. The defendant's motion for a statutory reduction as to compensatory damages is denied.
 IV. MOTION FOR REMITTITUR
The defendant has moved for a remittitur on the grounds that the awards of emotional distress damages as to count three, four and five and punitive damages as to count three are duplicative, excessive and against the weight of the evidence, and further that the award of future damages is speculative.
"Litigants have a constitutional right to have factual issues resolved by the jury. . . . The amount of a damage award is a matter peculiarly within the province of the trier of fact, in this case, the jury. . . . The size of the verdict alone does not determine whether it is excessive. The only practical test to apply to [a] verdict is whether the award falls somewhere within CT Page 16858 the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption." (Internal quotation marks omitted.) Ham v. Greene, supra, 248 Conn. 536; see also Gaudio v.Griffin Health Services Corp. , supra, 249 Conn. 551.
 A. Excessive and Duplicative Jury Award for Punitive Damages and Emotional Distress Damages
The defendant argues that the court must grant its motion for a remittitur because the court improperly encouraged a triple recovery for emotional distress damages under theories of gender discrimination (count three), negligent misrepresentation (count four) and negligent infliction of emotional distress (count five) on the plaintiff's verdict form and in its jury charge. The defendant also contends that the sparse amount of evidence concerning the plaintiff's emotional distress makes the amount awarded to the plaintiff excessive.
In light of the statutory reduction of punitive damages from $6 million to $300,000, it is unnecessary to address whether the $6 million awarded by the jury was excessive. Further, based upon the $243,000,000 unrestricted endowment of the defendant, the evidentiary basis for the award and the amount of compensatory damages awarded by the jury in this case, the court holds that $300,000 for punitive damages is reasonable under the circumstances. See also Ham v. Greene, supra, 248 Conn. 518
(refusing to grant remittitur when jury awarded punitive damages totaling $800,000 for two separate federal civil rights claims against two different defendants). The defendant's motion for a remittitur as to the punitive damages award is therefore denied.
The defendant also contends that the emotional distress damages were duplicative and excessive. Emotional distress damages were awarded as follows: Pursuant to Interrogatory #5, the jury awarded the plaintiff $2.5 million for "emotional distress (defined as emotional pain, suffering, anxiety, depression and humiliation) damages relating to the denial of tenure" caused by the defendant's gender discrimination and/or negligent misrepresentation. In Interrogatory #6, the jury awarded the plaintiff $2 million for "noneconomic compensatory damages, (other than those awarded in Interrogatory #5 . . .) for inconvenience and loss of enjoyment of life in connection with her loss of tenure as a result of defendant's discriminatory CT Page 16859 conduct." In Interrogatory #7, the jury awarded the plaintiff $1.5 million for negligent infliction of emotional distress based upon factual inaccuracies stated in the A P Committee's letters recommending denial of tenure. Specifically, the defendant claims that an award of negligent infliction of emotional distress damages is duplicative of the award for emotional distress under Title VII. In the alternative, the defendant argues that the emotional distress damages are excessive and against the weight of the evidence. Since the court has already granted the defendant's judgment notwithstanding the verdict as to the plaintiff's claim of negligent infliction of emotional distress set forth in count five for which the jury awarded $1.5 million dollars in damages, the court need only consider whether the $2.5 million in damages awarded pursuant to Interrogatory #5 and the $2 million awarded pursuant to Interrogatory #6 were excessive.
The defendant cites a number of cases where courts reduced emotional distress awards as excessive and insists that the total award for emotional distress should be in the range of $5,000 to $30,000. The plaintiff insists that the defendant improperly attempts to lump in her losses for inconvenience and loss of enjoyment of life with her other emotional distress claims. In addition, the plaintiff contends that the cases that the defendant cites do not contain claims of a permanent injury, which the plaintiff proved she suffered in this case as evidenced by her testimony and that of her husband. The plaintiff maintains that she is entitled to the full $2 million for the loss of enjoyment of life. The plaintiff also claims that she is entitled to at least $500,000 for other emotional distress damages and that an award of $1 million would not "shock the conscience." The plaintiff cites cases in which courts have refused to grant a remittitur or affirmed emotional distress damage awards in excess of $30,000.
The evidence established that the plaintiff overcame many obstacles to become an organic chemist. After attaining a master's degree and pursuing another career for several years, the evidence disclosed that, at the age of thirty-five, the plaintiff returned to graduate school to follow in the footsteps of her father and brother, to pursue a doctoral degree in organic chemistry, a field traditionally dominated by males. She received her degree, completed a postdoctoral fellowship and, in 1987, commenced a tenure track position at Trinity College, a well-respected liberal arts institution. She won an award for outstanding teaching, published at least two articles in two of CT Page 16860 the most prestigious publications in her field and engaged in research projects with her students in her laboratory at Trinity. In addition, she revised a laboratory manual for her father's organic chemistry textbook. At the time of her tenure application, she received the unanimous recommendation for tenure from her peers in Trinity's Chemistry Department. After twenty-two days of evidence, the jury concluded that the defendant's unlawful discrimination deprived the plaintiff of the opportunity to achieve her ambition of tenure, and to secure for herself the ability to perform the laboratory research which she relished. Based on the foregoing evidence, an award of $2 million for the loss of a career that the plaintiff loved and for which she struggled and sacrificed does not shock the conscience.
Interrogatory #6 is not duplicative of emotional distress damages awarded in Interrogatory #5 because it specifically limited recovery to "noneconomic compensatory damages, other thanany damages awarded in response to Interrogatory #5 for emotionaldistess . . . for inconvenience and loss of enjoyment of life in connection with her loss of tenure as a result of defendant's discriminatory conduct." (Emphasis in original.) In fact, the statutory language of 42 U.S.C. § 1981a and the policy guide of the Equal Employment Opportunity Commission list loss of enjoyment of life as a specific type of nonpecuniary loss that a victim of discrimination may recover. See Equal Employment Opportunity Commission, Policy Guide on Compensatory and Punitive Damages Under 1991 Civil Rights Act (1995). Therefore, the court denies the defendant's motion for a remittitur as to the $2 million in damages awarded under Interrogatory #6.
In addition to the plaintiff's evidence demonstrating the loss of enjoyment of life as a result of losing her career at Trinity, the plaintiff presented evidence demonstrating the other types of emotional harm she suffered. The plaintiff testified that she was "crushed" when she learned that she did not receive tenure. After the second denial by the defendant after the appeal brought by the chemistry department, the plaintiff sought psychological counseling for six sessions. She received a prescription for Xanax, but used only four pills. The plaintiff's psychologist testified that the plaintiff suffered from acute adjustment disorder with mixed emotional features. According to the plaintiff's psychologist, this meant that the plaintiff had ashort-term psychological reaction to an event.
Viewing the evidence in the light most favorable to the CT Page 16861 plaintiff, the court concludes that the plaintiff has not proven sufficient emotional distress to support the jury's award of $2.5 million dollars for emotional pain, suffering, anxiety, depression and humiliation as defined by Interrogatory #5 particularly when considered in light of the award of loss of life's enjoyment damages made pursuant to Interrogatory #6. The $2.5 million for emotional distress, as distinguished from the noncompensatory damages award for loss of her career as a result of gender discrimination, does "shock the court's sense of justice."
The foregoing conclusion is supported in part by an analysis of the awards to plaintiff's for emotional distress in other Connecticut state and federal decisions including Gaudio v.Griffin Health Services Corp. , supra, 249 Conn. 550-53. See alsoBuckman v. People Express, Inc., 205 Conn. 166, 176, 530 A.2d 596
(1987) ($50,000 for plaintiff wrongfully prevented from continuing his insurance coverage when defendant knew plaintiff suffered from recurrent ulcer, dental and other heath problems);Berry v. Loiseau, 223 Conn. 786, 798, 614 A.2d 414 (1992) (court refused to grant a remittitur when the jury awarded a plaintiff $50,000 for post traumatic stress disorder as a result of intentional infliction of emotional distress arising out of the physical abuse and threats to plaintiff by his former employers);Oakes v. New England Dairies, Inc., 219 Conn. 1, 10, 15,591 A.2d 1261 (1991) (award of $97,000 for depression and physical symptoms not outside "the necessarily uncertain limits of just damages" after his employer wrongfully terminated plaintiff because he filed a workers' compensation claim).
In a recent employment discrimination case in the United States District Court for the District of Connecticut, a jury awarded $250,000 for compensatory damages based upon the pain and suffering caused by the defendant's discriminatory conduct. Byarsv. Waterbury, District Court, Docket No. 1329 (D. Conn. February 11, 1999). The court concluded that damages were excessive because the plaintiff presented no evidence that he suffered "an extreme emotional or medical injury." Id. The court stated: "In `garden variety,' discrimination cases in which the plaintiff suffers depression, sadness, and loss of pride, the maximum amount for pain and suffering appears to be roughly $50,000." Id. Therefore, the court reduced damages for pain and suffering to $50,000.
While the plaintiff did present evidence that she was CT Page 16862 devastated as a result of her loss of tenure, the court agrees with the defendant that much of the award of damages for emotional distress pursuant to Interrogatory #5 was excessive in light of the damages awarded by the jury in response to Interrogatory #6. Therefore, based on all the foregoing considerations, the court concludes that an award of $2.5 million for emotional distress as defined in Interrogatory #5 is excessive and "shocks the conscience", and therefore, reduces it to $50,000. The court notes that in response to the initial order of the court filed September 27, 1999, the plaintiff accepted the remittitur which reflects an acceptance of the reduction of the amount of noneconomic damages to a total of $2.45 million.[10]
See Gaudio v. Griffin Health Services Corp. , supra,249 Conn. 555-56.
B. Future Damages Are Speculative
In Interrogatory #3, the jury found the defendant liable to the plaintiff for $344,990 for future wages and fringe benefits. In Interrogatory #4, the jury found the defendant liable for increased tax liability assessed to the plaintiff for damages awarded pursuant to Interrogatory #3 in the amount of $125,802. The defendant contends that any future damages awarded to the plaintiff beyond one year after the trial are speculative and the court should order a remittitur on that basis. The plaintiff argues that the amount of the future damages award was reasonable and supported by the evidence.
"Whatever the origins of damages for future lost wages... such damages can be awarded in actions for breach of an implied contract of employment, as long as they are limited to a reasonable time and are supported by the evidence." Torosyan v.Boehringer Ingelheim Pharmaceuticals, Inc., 234 Conn. 1, 33-34,662 A.2d 89 (1995). During the trial, the jury was presented with evidence that the plaintiff intended to remain at Trinity at least until she reached the age of sixty-five, or perhaps until the age of seventy. The jury awarded the plaintiff future damages for ten years after the trial, or until she reached the age of sixty-five. They based their award on the projections and calculations presented by the plaintiff's economist, Dr. Arthur Wright, by way of testimony and Plaintiff's Exhibits 63a, 63b, 104 and 109. The fact that they applied the information contained in the exhibits consistently in making their awards indicates that they understood and critically evaluated the evidence presented. The court is satisfied that these awards were not CT Page 16863 based on speculation. Rather, there was a substantial evidentiary basis for the jury to reasonably award the plaintiff future wages and fringe benefits until the age of sixty-five.
 V. MOTION FOR NEW TRIAL
The defendant has moved, in the alternative, for a new trial on the grounds that the court improperly instructed the jury, gave the jury inappropriate verdict forms and special interrogatories, ruled erroneously on evidence and failed to give curative instructions regarding improper closing argument of the plaintiff's counsel, and made prejudicial comments, the cumulative effect of which warrant the setting aside of the verdict and a new trial.
A. Erroneous or Improper Jury Instructions
The defendant claims that the court's failure to charge on "the academic judgment rule" in the manner it requested fatally prejudiced the defendant as to all of the plaintiff's claims, that the court provided an incorrect standard as to the breach of contract claim (count one); that the court improperly marshaled the evidence in the charge by highlighting certain evidence of the plaintiff; that the court improperly charged that the jury could award emotional distress damages for negligent misrepresentation (count four); that the court improperly instructed the jury as to damages as to all counts; and finally, that the court improperly failed to charge on other issues as requested by defendant. These claims have no merit.
In reviewing a trial court's jury instructions, the Connecticut appellate courts "adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [The courts] do not critically dissect the charge in order to discover possible inaccurate statements. . . . Rather, [the courts] see if [the jury instructions] gave the jury a reasonably clear comprehension of the issues presented for their determination under the pleadings and upon the evidence and were suited to guide the jury in the determination of those issues. . . . [I]n [the] task of reviewing jury instructions, [the courts] view the instructions as part of the whole trial. . . . As long as [the instructions] are CT Page 16864 correct in law, adapted to the issues and sufficient for the guidance of the jury . . . [the courts] will not view the instructions as improper. Even if instructions are found to be improper, [the courts] must further determine whether they have been prejudicial to the claiming party by adversely affecting the trial's outcome." (Citations omitted; internal quotation marks omitted.) Blanchette v. Barrett, 229 Conn. 256, 280-81,640 A.2d 74 (1994).
1. Academic Judgment
The defendant argues that the court did not adequately charge the jury that it could not substitute its own judgment for the academic judgment of the A P Committee, and asserts that this failure prejudiced the entire case against the defendant. The defendant relies upon Gupta v. New Britain General Hospital,239 Conn. 574, 594-98, 687 A.2d 111 (1996), for the proposition that the defendant's denial of tenure to the plaintiff was an academic, rather than an employment decision. This claim is without merit for at least two equally compelling reasons. First, the defendant's claim of fatal prejudice as to all claims is belied by the fact that the jury returned a defendant's verdict as to the plaintiff's age discrimination claim set forth in count two. Second, Gupta is inapposite because the court found that the primary purpose of the medical residency agreement at issue in that case was educational and that the plaintiff's dismissal from the program was essentially an academic decision. By contrast, the essence of the relationship between the plaintiff and Trinity College was primarily one between employer and employee to which general contract principles apply. Academic judgment was relevant in connection with the age and discrimination claims (counts two and three) where the court appropriately charged the jury on the issue of academic judgment in connection with the nondiscriminatory reason advanced by defendant as the basis of its decision to deny the plaintiff tenure. The court instructed the jury as follows: "Trinity has presented evidence that it had a legitimate nondiscriminatory reason for denying the plaintiff tenure. A legitimate nondiscriminatory reason is any reason or explanation unrelated to age or gender. In considering Trinity's stated reasons for its decision denying the plaintiff tenure, it is not your role to decide whether or not you agree with the college's tenure decision. It is not enough for you to find that plaintiff deserved tenure and that Trinity made a mistake. In order for the plaintiff to prevail, she must prove by a preponderance of the evidence that Trinity denied her tenure CT Page 16865 because of her age or gender or both." (Defendant's Memorandum of Law, January 25, 1999, Exhibit B, pp. 23-24.)
"`The court is under no duty at any time to charge in the exact language requested. . . . Failure to charge precisely as proposed by a [party] is not error where the point is fairly covered in the charge. . . . Instructions are adequate if they give the jury a clear understanding of the issues and proper guidance in determining those issues.'" (Citations omitted.)Coble v. Maloney, 34 Conn. App. 655, 672, 643 A.2d 277 (1994), quoting Tomezuk v. Alvarez, 184 Conn. 182, 190, 439 A.2d 935
(1981).
While the court did not instruct the jury exactly in the words that the defendant sought, the court sufficiently charged the jury concerning the academic judgment of the defendant in a manner that was not prejudicial or confusing. The defendant's contention that the court's instruction encouraged the jury to find that the plaintiff deserved tenure and that the defendant made a mistake is meritless. To the contrary, the court specifically charged that it was not the role of the jury to find that the plaintiff deserved tenure and that the defendant made a mistake. On the other hand, the defendant sought an instruction on academic judgment that would have insulated Trinity from discriminatory actions as a matter of law. "[A]n employee's right not to be denied tenure for discriminatory reasons prevents insulating the tenure process from any judicial review." Brown v.Trustees of Boston University, 891 F.2d 337, 346, (1st Cir. 1989), cert. denied, 496 U.S. 937, 110 S.Ct. 3216,110 L.Ed.2d 664 (1990); see also Powell v. Syracuse University,580 F.2d 1150, 1154 (2d Cir. 1978) ("Academic freedom does not include the freedom to discriminate against tenure candidates on the basis of sex and other impermissible grounds.") Since the court's instruction required the plaintiff to show that the defendant discriminated against her based upon her age or gender or both, it was entirely proper. Therefore, the defendant is not entitled to a new trial on this basis.
2. Improper Standard for Breach of Contract
Next, the defendant contends that the court incorrectly instructed the jury that the plaintiff must prove that the defendant breached its contract by a preponderance of the evidence. The defendant claims that the court should have instructed that the plaintiff must prove that the defendant's CT Page 16866 decision resulted from "arbitrary, capricious and bad faith conduct", relying on Gupta v. New Britain General Hospital, supra, 239 Conn. 594. The plaintiff argues that courts may state a reluctance to review tenure decisions, but invariably consider whether illegal conduct occurred. The defendant's reliance on aGupta is misplaced.
In Gupta v. New Britain General Hospital, supra,239 Conn. 575, the plaintiff alleged that the defendant hospital breached an employment contract by dismissing him from the defendant's surgical residency program. The Connecticut Supreme Court addressed whether the surgical residency agreement constituted an employment or educational relationship between the parties. See id., 581-82. In making this determination, the court weighed several factors including "the language of the agreement, the purpose of the parties in entering into the agreement, and the institutional setting of the agreement." Id., 583. The court observed that the residency agreement stated: "`The general objectives of the Program are to provide to the Physician a proper educational experience in the professional field encompassed by the program while simultaneously providing to the Hospital's patients a high quality of health care.'" Id., 584. In addition, the agreement stated: "`The Program covered by this Agreement is part of an overall program of education provided at the [h]ospital.'" Id. (Emphasis original.) While the residency created "a hybrid relationship containing both employment and
educational features," the court held that "the hospital's decision to dismiss the plaintiff for poor clinical performance constituted an academic, rather than an employment, decision." Id., 586, 588. (Emphasis original.)
Once the court determined that the decision to terminate the plaintiff in Gupta from the residency program involved an academic decision, the court noted that it treats any challenge to the motivation of the hospital in terminating a residency with "caution, and with great deference to academic decisionmaking." Id., 594. The court observed that the plaintiff "bears a heavy burden in proving that his dismissal resulted from arbitrary, capricious, or bad faith conduct on the part of the hospital." Id., 596. The hospital's decision had to have "no discernable rational basis." (Internal quotation marks omitted.) Id.
The instant case presents a factual scenario clearly distinguishable from Gupta. In contrast to Gupta, the purpose of the contract between the parties concerned the plaintiff's CT Page 16867 employment for a period of six years, the terms of which were set forth in the faculty manual (Exhibit 2). The faculty manual very specifically detailed the responsibilities of both employer and employee in connection with the tenure process. While the plaintiff was obligated to achieve certain standards in two year stages, the A P Committee was obligated to inform her of its assessment of her progress and advise her what she needed to do to achieve tenure at each step along the way. At the heart of the plaintiff's case is her claim that the defendant, acting through its A P Committee, breached the terms of their employment contract, specifically the procedures and policies set forth in Section 12 of the faculty manual. Accordingly, the court's instructions evenhandedly presented the plaintiff's claims of breach of contract which did not challenge the A P Committee's academic judgment. Instead, the plaintiff's claims addressed whether the A P Committee properly followed the mandated tenure procedures and whether the A P Committee failed to give proper consideration to the plaintiff under its affirmative action policy. Therefore, the defendant's claim for a new trial on this ground fails.
3. Improper Marshaling of Evidence
The defendant next claims that the court improperly marshaled the evidence. "The degree to which reference to the evidence may be called for lies largely in the discretion of the court." (Internal quotation marks omitted.) Logan v. Greenwich HospitalAssn., 191 Conn. 282, 297, 465 A.2d 294 (1983). The nature and extent of the trial court's comments on the evidence "depend on the facts involved in a particular case and the manner in which it has been tried; and the matter of commenting on evidence rests in the trial court's sound discretion." Anderson McPadden, Inc.v. Tunucci, 167 Conn. 584, 590, 356 A.2d 873 (1975).
The defendant claims that the court improperly highlighted certain evidence of the plaintiff to the prejudice of the defendant. The court conducted charging conferences on a least three separate days, two of which were on the record on January 7 and 8, 1999. The jury heard evidence on twenty-two trial days which began on November 19, 1998, and concluded on January 11, 1999. There were five distinct legal theories and numerous theories of damages for the jury to consider. All of the issues were vigorously and exhaustively litigated. In charging the jury, it was necessary to present each side's theory of the case. The court invited the defendant to suggest language in response to CT Page 16868 the articulation of the plaintiff's claims which was incorporated into the charge by the court where appropriate. (See Transcript, January 8, 1999, pp. 49, 51, 55-56, 65, 68, 69, 72, 105-06, 114-15, 120.) Since this was a complex and lengthy case, the court, in its discretion, considered it appropriate and necessary to highlight the claims of the parties in an effort to crystalize the issues for the jury. The court did not present the evidence in its jury charge in a manner that overemphasized any particular item and favored any particular party. Rather, the court took pains to accommodate the concerns of counsel for both parties. In addition, the court instructed the jury as follows:
 If, in the course of these instructions, I refer to certain facts or certain evidence in the case, you're not to assume that I mean to emphasize those facts or that evidence; nor should you limit your consideration to the things that I may mention.
 Likewise, you should attach no importance to it if I should mention one party more than the other. If I should overlook any evidence in the case, you will supply it from your own recollection; and if I incorrectly state anything about the evidence in relation to what you remember, you should apply your own recollection and correct my error.
 In the same way, what any of the lawyers may have said in their summations to you as to the facts or evidence in the case should have weight with you only if their recollection agrees with your own, otherwise, it's your own recollection of the facts and evidence which should have weight in your deliberations. For, after all, it is your function and your duty to weigh the evidence offered, make the proper deductions or inferences from it, and determine the facts; and what counsel say to you, and what I say to you, as to the facts, should have weight with you only so far as you approve it in your own minds.
 You should understand that I do not have any preference as to the outcome of this case. I have not meant to convey, by facial expression or tone of my voice, or by any comments, by any body language or in any other way at any time during the trial, any preference or inclination as to how you should decide the facts, and you should not make any such interpretations as to how I think. It is simply not relevant to your decision. CT Page 16869
 If I refer to one party more than the other, or to anything that in your mind suggests a preference on my part for one side or the other, it is not done on purpose. My task has been to apply the rules of evidence, and deal with legal issues as they may have arisen during the course of the trial, and to instruct you on the law. It is for you, the jury, and for you alone, to decide the outcome of this case.
 I instruct you not to single out any sentence, or any individual point, or instruction in my charge, and ignore the others. You are to consider all the instructions as a whole and regard each in light of all of the others. The order in which the instructions are given has no significance as to their relative importance.
 Transcript, January 11, 1999, pp. 103-05: Thus, even if the court may have mentioned the plaintiff's claims more than those of the defendant, they were not unduly emphasized. Moreover, the jury was clearly instructed that if one party was mentioned more than the other, it was not purposeful and not to read anything into it. The jury is presumed to follow the court's instructions. "The court's review of the evidence in its charge to the jury is subject to the overriding consideration that its comments be fair and that they not mislead the jury, so that injustice is not done to either party." Anderson McPadden, Inc. v. Tunucci, supra, 167 Conn. 589. The court's charge, when taken as a whole under the circumstances of this case, fairly presented the issues, did not mislead the jury and was not unjust to either party. Therefore, the court concludes that the defendant is not entitled to a new trial on this basis.
 4. Improper Charge That Damages for Emotional Distress Could Be Awarded for Negligent Misrepresentation
The defendant argues that the court improperly charged the jury regarding emotional distress damages for the plaintiff's negligent misrepresentation claim. Based upon the reasoning set forth in Part II (B)(1) of this opinion, the court concludes that the defendant is not entitled to a new trial on this basis.
 5. Improper Charge That The Plaintiff Is Entitled to Damages Without Proof of Damages CT Page 16870
The court finds no merit in this claim. With respect to damages, the court comprehensively instructed the jury as to each of the several types of damages in connection with the plaintiff's various statutory and common law claims. In pertinent part, the court instructed the jury as follows: "It is plaintiff's burden to satisfy you by a preponderance of the evidence as to her entitlement to damages. You must not speculate or guess as to the nature and extent of such damages. The amount must be fair, just and reasonable in accordance with these instructions." Transcript, January 11, 1999, p. 134. The court instructed the jury concerning the necessity for the plaintiff to prove her damages and did so in a manner that was not prejudicial to the defendant. See Glucksman v. Walters, 38 Conn. App. 140,157, 659 A.2d 1217, cert. denied, 235 Conn. 914, 665 A.2d 608
(1995). Therefore, this claim fails.
6. Failure to Charge As Requested by Trinity
The defendant argues that it was prejudiced when the court failed to instruct the jury that witnesses may confer with lawyers before testifying, that deference must be given to the A P Committee's interpretation of the affirmative action provisions of the faculty manual and that breach of the covenant of good faith and fair dealing requires a showing of bad faith. The plaintiff contends that jury instructions must be based upon the evidence, and, therefore, refusal to give an instruction that witnesses may confer with lawyers was not improper or prejudicial. The plaintiff also insists that the defendant was not entitled to deference in its interpretation of the affirmative action policy because the defendant drafted the policy and any ambiguity should favor the plaintiff. Finally, the plaintiff also argues that the implied covenant of good faith and fair dealing may properly be used to guide the interpretation of the agreement between the parties.
As to the plaintiff's counsel's questions on cross-examination concerning witnesses conferring with defense counsel, the defendant cites no authority for its position. Practice Book § 16-23(a) provides in relevant part: "When there are several requests, they shall be in separate and numbered paragraphs, each containing a single proposition of law clearly and concisely stated with the citation of authority upon which it is based, and the evidence to which the proposition would apply." (Emphasis added.) Moreover, this matter was not relevant to any issue in the case. Finally, since it is common sense that parties CT Page 16871 and witnesses meet with counsel prior to testifying, the defendant was not prejudiced by the court's failing to charge on this subject.
The defendant next claims that the court should have charged the jury that deference must be given to the interpretation of the affirmative action policy by the A P Committee because it is the party responsible for interpretation of those provisions. This argument is misplaced and ignores fundamental principles of contract interpretation. "It is a general rule of construction that whenever two interpretations of a contract seem equally possible, the language will be construed against the party responsible for its inclusion." (Internal quotation marks omitted.) Mongillo v. Commissioner, 214 Conn. 225, 231,571 A.2d 112 (1990). In this case, the defendant is accountable for all the provisions of the faculty manual relating to affirmative action.
Finally, the defendant's claim that the court eviscerated the traditional and proper instruction on the breach of the covenant of good faith and fair dealing is without merit. First, an instruction on bad faith was unnecessary because the plaintiff withdrew her claim of breach of the covenant of good faith and fair dealing. Second, the court instructed the jury concerning the existence of an implied covenant of good faith and fair dealing in order to aid in the interpretation of the faculty manual. See Transcript, January 11, 1999, pp. 120-21. This instruction is consistent with well-settled principles of contract interpretation. See Warner v. Konover, 210 Conn. 150,155, 553 A.2d 1138 (1989); 2 Restatement (Second), Contracts § 205 (1981).
 7. Prejudice Based on Verdict Forms and Special Interrogatories
The defendant also contends that the court prejudiced and misled the jury by failing to use the defendant's proposed special interrogatories and providing special interrogatories attached only to the plaintiff's verdict form. The plaintiff responds that there would be no reason for the jury to answer the interrogatories unless they found in favor of the plaintiff on any particular count of the complaint.
"[T]he use of interrogatories has long been accepted practice in this state . . . their use to avoid the implications of a general CT Page 16872 verdict has long been favored by this court. . . . [A] trial court has broad discretion to regulate the manner in which interrogatories are presented to the jury, as well as their form and content. . . . Sound discretion, by definition, means a discretion that is not exercised arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law. . . ." (Citations omitted; internal quotation marks omitted.) Emerick v. Kuhn, 52 Conn. App. 724,745-46 ___ A.2d ___, cert. denied, 249 Conn. 929, ___ A.2d ___ (1999).
The interrogatories attached to the plaintiff's verdict form were not prejudicial to the defendant and adequately clear and concise. They were designed principally to complement the jury instructions on damages by providing a road map to the jury to address the various types of damages that were available as to each of the five counts of the complaint in a manner that would minimize the risk of duplication. (Transcript, January 11, 1999, p. 151.) Interrogatories #10 through #13 were submitted in an effort to avoid a general verdict as to counts one and four where the evidence presented supported two theories of liability as to breach of contract and negligent misrepresentation, respectively. The fact that the jury requested a copy of the instructions on the first full day of deliberations suggests that the instructions were in fact used by the jury for exactly that purpose to work their way through the verdict forms and the interrogatories. The consistency of the verdicts support this conclusion. That the jury returned a defendant's verdict as to the age discrimination claim (count three) and responded no to the Interrogatory #8, which was the only interrogatory that related exclusively to age discrimination, indicates that the interrogatories accomplished exactly what they were supposed to do without confusion.[11] Further, the court concluded that the interrogatories that the defendant requested were lengthy, confusing, included certain irrelevant questions, and misstated the law. Finally, Interrogatories #5, #6 and #7 were designed to separate out the noneconomic compensatory damages available to the plaintiff if she prevailed on counts three (gender discrimination), count four (negligent misrepresentation) and count five (negligent infliction of emotional distress). Under the circumstances of this case, and in light of the court's ruling on the sufficiency of count five, it was obviously to the defendant's benefit to have the jury consider any damages attributable to that count separately. The court therefore rejects the defendant's challenge to the verdict forms and CT Page 16873 special interrogatories.
B. Erroneous Evidentiary Rulings
"It is well settled that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . [Its] ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . (Citations omitted; emphasis in original; internal quotation marks omitted.) Gaudiov. Griffin Health Services Corp. , supra, 249 Conn. 546-547.
1. Comparative Evidence
The defendant contends that it was improper to allow the admission of the portions of the tenure files of Jack Chatfield and Paula Russo proffered by plaintiff. Once this evidence was admitted, the defendant further contends that it was improper to exclude remaining portions of the Chatfield and Russo tenure files as well as the files of the four other tenure candidates in 1993 and the file of Richard Progodich, a successful tenure candidate in the chemistry department in 1991. The plaintiff maintains that the purpose of her offer of portions of the Chatfield and Russo tenure files was for comparative purposes to show disparate treatment in support of her discrimination claims. Specifically, the plaintiff asserts that the evidence that she introduced supported her claim that the A P Committee applied tenure procedures and criteria to her case differently than as to Chatfield and Russo. The plaintiff further maintained that the tenure files of the four other candidates that year and the tenure file of a tenure candidate two years earlier were not relevant to any issue in the case. The defendant's claim has no merit.
Since the plaintiff claimed age and gender discrimination on the basis of disparate treatment, it would have been error to exclude comparative evidence of the way the A P Committee applied the provisions of the faculty manual to individuals who were similarly situated to the plaintiff. The court holds that the probative value of the limited comparative evidence allowed far outweighed any prejudicial effect that the defendant may have suffered as a result of its introduction. Any danger that this evidence would invite members of the jury to substitute their judgment for the academic judgment of the A P Committee was CT Page 16874 dispelled by the court's charge on this issue as discussed more fully in Section V (A)(1) of this opinion.[12]
After the court admitted the foregoing comparative evidence, the defendant sought to introduce the entire tenure files of Chatfield, Russo and those of the four other tenure candidates that year, as well as, Progodich, a tenure candidate in 1991. The court allowed the defendant to introduce into evidence other portions of the Chatfield and Russo files which it found were material, including letters from faculty members in their respective departments and outside reviewers which had some relevance to scholarship, but denied the inclusion of other documents deemed immaterial to the case which included letters from students and others outside the history and mathematics departments relating to the teaching of Chatfield or Russo, since teaching was not an issue in the case. As to the four other 1993 tenure candidates, although the court allowed the introduction of the second reappointment letters from their files and permitted the defendant wide ranging questions on their candidacies, the court excluded the full tenure files of these individuals because their relationship to the case was tangential at best and because of the concern of the court that the sheer volume of those files would sidetrack and divert the jury's attention from the real issues at hand. See State v. Dematteo, 186 Conn. 696, 702-703,443 A.2d 915 (1982). The court excluded any evidence relating to Prigodich because his promotion occurred two years prior to the plaintiff's tenure denial, he was awarded tenure by a different A P Committee and the offer of evidence from his tenure file appeared to be a transparent effort by the defendant to invite the jury to compare his unusually prolific record of scholarship as a chemist with that of plaintiff to her substantial prejudice. (Transcript, December 9, 1998, Excerpt of Proceedings, pp. 14, 59, 63.)
2. Inconsistent and Other Prejudicial Rulings
During the trial, the court indicated to the parties that only documents and other information actually considered by the A P Committee would be relevant to a determination of the issues in this case. The defendant contends that the court ruled inconsistently and prejudicially when it admitted certain evidence that the plaintiff proffered which was not before the A P Committee, and excluded certain evidence that the defendant proffered. Specifically, the defendant complains that the court should not have admitted Plaintiff's Exhibit 48, a foundational CT Page 16875 document that Professor Henderson[13] used to prepare a chart and analysis of publication rates of similarly situated assistant professors in chemistry at other colleges included in Plaintiff's Exhibit 56. Exhibit 56 was a letter and other documents including the chart, submitted by Henderson on behalf of the plaintiff's colleagues in the chemistry department, to Dean Jan Cohn, the secretary of the A P Committee, unanimously recommending the plaintiff for tenure. The admission of Exhibit 48 was sought by the plaintiff to counter the defendant's attack on the chart and to put the number of the plaintiff's publications in context. Although Exhibit 48 was not before the A P Committee, the court allowed its admission when the defendant "opened the door" by attacking the credibility and validity of the chart and its foundation as it appeared in the plaintiff's Exhibit 56. The probative value of Exhibit 48 therefore outweighed any prejudice to the defendant.
The defendant also argues that the court inconsistently allowed the plaintiff to offer the testimony of Dana Mayo, a professor of organic chemistry at Bowdoin College, to explain a letter that he had sent to the A P Committee, but the court did not allow the defendant's witness, Henry DePhillips, a professor of physical chemistry at Trinity and a member of the A P Committee, explain what he really meant by his phrasing in the letter he had submitted to the A P Committee in support of the plaintiff's tenure candidacy. These rulings were not inconsistent. In ruling on pretrial motions, the court indicated that it would allow parties to introduce the letters of the outside reviewers that were before the A P Committee and evidence to explain the meaning of technical information presented to the committee. (Transcript, November 19, 1998, p. 31.) In so ruling the court stated: "I think it would be misleading to the jury . . . to go beyond [the] opinions [expressed in the letters to the A P Committee]. But certainly he [the plaintiff's counsel] can go behind their opinions. . . . I think you can go beyond in terms of the foundation for their opinions and for their background and experience, but going beyond what they have said in their letters with respect to their opinion of Dr. Craine I'm not going to allow." (Transcript, November 19, 1998, p. 31.) Consistent with this ruling, the court allowed the testimony of Mayo, an organic chemist and outside evaluator of the plaintiff's scholarship, in order for the jury to understand who he was and why his expert opinion was solicited by the defendant and considered in the tenure process. (See Transcript, November 19, 1998, p. 33.) On the other hand, CT Page 16876 DePhillips sought to testify in a manner which would have contradicted his letter submitted on the plaintiff's behalf to the A P Committee. Since the plain meaning of DePhillips' letter to the A P Committee was sufficiently clear to a person of ordinary intelligence, his testimony attempting to undermine his own letter was properly excluded. Therefore, this claim fails.
3. Improper Rebuttal
The defendant argues that the court erroneously permitted the plaintiff to present an improper rebuttal case. Specifically, the defendant objects to Charles "Bud" Schultz's interpretation of the faculty manual, the entire testimony of Mayo, the rebuttal testimony of the plaintiff six weeks after her extensive prior testimony, and the use of two charts as visual aids during the plaintiff's rebuttal testimony that were not before the A P Committee.
"[R]ebuttal evidence is that which refutes the evidence presented by the defense, rather than that which merely bolsters the [plaintiff's] case. . . . The admission of rebuttal evidence is ordinarily within the sound discretion of the trial court." (Citations omitted; internal quotation marks omitted.) State v.Cepeda, 51 Conn. App. 409, 439, 723 A.2d 331, cert. denied,248 Conn. 912, ___ A.2d ___, (1999). The defendant has failed to demonstrate that the rebuttal evidence was improper.
The defendant challenges Schultz's testimony regarding the defendant's faculty manual as irrelevant and improper rebuttal. Schultz served as an American Association of University Professors (AAUP) grievance committee member contemporaneously with the plaintiff's employment by the defendant. The AAUP grievance committee offered advice to tenure candidates concerning grounds for appeal when denied tenure by the A P Committee. (Transcript, January 6, 1999, p. 20.) While it is true that Schultz never served on the A P Committee, his experience on the AAUP grievance committee, his knowledge of Henderson's role in drafting the chemistry department's appeal of the plaintiff's original denial of tenure and his familiarity with the provisions of the faculty manual relied on in the appeal, provided the jury with a proper rebuttal of both Henderson's testimony and the testimony of both Professors Miller Brown and Jan Cohn as to the A P Committee's interpretation of the certain terms of the faculty manual. While Schultz was originally CT Page 16877 called as a rebuttal witness concerning Henderson's role in the chemistry department's appeal of the negative tenure decision, the expansion of Schultz's testimony to include his own interpretation of Section 12 of the faculty manual was invited by defense counsel's cross-examination of him. The claim that Schultz's testimony was improper rebuttal is therefore without merit. (Transcript, January 6, 1999, pp. 40-46.)
The defendant also objects to the entire rebuttal testimony of Professor Dana Mayo, an organic chemist from Bowdoin College, as being irrelevant, prejudicial and beyond the scope of expert disclosure. Since Mayo's testimony was proper rebuttal, this claim fails. The plaintiff argues that Mayo's testimony was relevant because Brown's testimony attacked Mayo's reputation and his letter to the defendant recommending tenure in response to an inquiry made to him by the A P Committee. The plaintiff also notes that she disclosed that Mayo was a potential witness.
During his testimony, Brown gave an exceptionally critical reading of the letter sent by Mayo to the A P Committee. Mayo's testimony was proper rebuttal and relevant to provide the jury with a proper foundation and context to Mayo's letter, which the plaintiff claimed was deliberately misinterpreted by Miller in the course of his testimony. (Transcript, January 6, 1999, pp. 76-112.) Since the jury was not comprised of tenured faculty in the field of chemistry who understood exactly how the tenure process works, Mayo's testimony was properly admissible to directly refute Brown's overly critical reading of his letter and the opinions he expressed therein.
The defendant also claims that the plaintiff was able "to reinvent her own testimony and revisit entire topics regarding her scholarship some six weeks after she had testified extensively in her case-in-chief, which was improper rebuttal testimony." (Defendant's Memorandum of Law, January 25, 1999, p. 57.) In presenting its case, the defendant mounted an extensive and unrelenting attack on the plaintiff's scholarship and teaching and claimed repeatedly over several days through several witnesses, including two prominent members of the defendant's chemistry department who once vociferously advocated her tenure case (Henderson and DePhillips), that she did not have a significant research program. Since the plaintiff claimed the comprehensive attack on her scholarship was a defense created for trial which she could not have reasonably anticipated, and she had the overall burden of proof, she was entitled to explain her CT Page 16878 research program by way of rebuttal. See State v. Cepeda, supra,51 Conn. App. 439. The use of Exhibits 111 and 112 for identification were appropriate for demonstrative use during the plaintiff's rebuttal testimony as visual aids because of the subject matter of her research in the highly technical field of organic chemistry and the complexity and length of the case. For all the reasons previously stated, the defendant is not entitled to a new trial based on the court's evidentiary rulings.
4. Improper Statements of Counsel
"A verdict should be set aside if there has been manifest injury to a litigant, and it is singularly the trial court's function to assess when such injury has been done since it is only that court which can appraise the atmosphere prevailing in the courtroom." Yeske v. Avon Old Farms School, Inc.,1 Conn. App. 195, 204-05, 470 A.2d 705 (1984), citing Pisel v. StamfordHospital, 180 Conn. 314, 322, 430 A.2d 1 (1980).
The defendant argues that the court must set aside the verdict and order a new trial because of three improper statements during closing arguments by the plaintiff's counsel. The defendant cites as error the court's failure to give curative instructions for repeated references to personal beliefs of the plaintiff's counsel about issues in the case, references to the emotional distress caused to the plaintiff because of the litigation, and the demand to "send a message to Trinity with your verdict."
First, the defendant contends that the plaintiff's counsel improperly offered his opinion during his closing argument. The plaintiff responds that the defendant did not raise the issue in a timely manner. Any allegedly improper comments were remedied by the court's repeated instruction to the jury throughout the trial that the argument or statements of counsel in the making of motions or in the opening and closing remarks are not evidence. The court also told the jury at the beginning of the charge which immediately followed closing argument: "Also, throughout the trial, ladies and gentlemen, there have been occasions when counsel for the parties have engaged in discussions between themselves or have made comments which may have reflected their feelings and attitudes toward the evidence and toward the case as a whole. You should disregard these remarks and not allow them to influence your consideration of the case." In instructing the jury as to what they can and cannot rely upon as evidence, the CT Page 16879 court instructed: "The statements made by lawyers, including statements made both in their opening statements and in their closing arguments are not evidence." (Transcript, January 11, 1999, pp. 100-01, 105-06.) And finally, the court instructed: "I must emphasize to you that any expression of the attorney's opinion regarding what they believe the proper measure of damages should be is only their opinion. It is not evidence in this case, but is only argument and is not binding on you. The determination of whether damages should be awarded and, if so, the amount of those damages to be awarded, if any, is solely your function." (Transcript, July 11, 1999, p. 149). See also Delott v. Roraback,179 Conn. 406, 410, 426 A.2d 791 (1980).
The defendant also argues that the plaintiff's counsel improperly sought emotional distress damages based upon the additional stress caused by the present litigation. The defendant did not object to the argument of the plaintiff's counsel until the conclusion of his rebuttal argument and immediately before the court's jury instructions. Since the court provided the correct instructions to the jury regarding emotional distress damages immediately following the plaintiff's alleged improper argument, the court concludes that such argument was harmless and did not improperly influence the jury because of the extent and specificity of the court's instructions as to the proper elements of damages were for the jury's consideration. Thus, any improper argument by the plaintiff's counsel on this point is deemed cured.
Finally, the defendant claims that the demand of the plaintiff's counsel during the rebuttal argument to "send a message to Trinity with your verdict" improperly sought to have the jury decide the case based upon passion or prejudice. CompareMcKee v. Erikson, 37 Conn. App. 146, 152, 654 A.2d 1263 (1995) (defendant's counsel argued that plaintiff, a recipient of state assistance, was "suit happy," looking for a "hand out" and the jury should "send a message to the public by not granting or rewarding this type of activity where there was no evidence that plaintiff's claim was fraudulent). The facts of the present case are clearly distinguishable from McKee in that the plaintiff's counsel did not attempt to have the jurors make their decision on mnatters that were not in evidence. Further, the plaintiff sought an award of punitive damages in this case as she was entitled to under Title VII. "[T]he purpose of punitive damages is to vindicate the public interest. . . ." Freeman v. Alamo ManagementCo., 221 Conn. 674, 679, 607 A.2d 370 (1992). Punitive damages CT Page 16880 are "not merely to deter a particular defendant from future conduct but to deter others from committing similar wrongs."Champagne v. Raybestos-Manhattan, Inc., 212 Conn. 509, 562-63,562 A.2d 1100 (1989). In connection with her claim for punitive damages, it was not unreasonable or improper argument to urge the jury to send a message with its verdict if it found that Trinity's act(s) of gender discrimination against the plaintiff were done with actual malice or with reckless indifference as to her rights under Title VII in an effort "to punish the defendant and to prevent similar conduct in the future." (Defendant's Supplemental Proposed Preliminary Jury Instructions, December 2, 1998, p. 16.)
Finally, when viewed in the context of the entire trial which was protracted and replete with contentious argument, the court finds that foregoing remarks were merely expressions of the zeal of the plaintiff's counsel in the heat of argument and not sufficiently blatant or prejudicial to warrant a curative instruction. See Nevers v. Van Zuilen, 47 Conn. App. 46, 53,700 A.2d 726 (1997), citing State v. Hansen, 39 Conn. App. 384, 395,666 A.2d 421, cert. denied, 235 Conn. 928, 667 A.2d 554 (1995). Moreover, while the defendant's counsel requested curative instructions immediately following closing argument, he apparently did not deem the comments sufficiently egregious to warrant a mistrial since he did not move for one. Therefore, there is no basis for a new trial on the grounds of improper statements of counsel.
5. Cumulative Effect of Error and Judge's Comments
The defendant next argues that the cumulative effect of the alleged errors made by the trial court requires a new trial. The defendant also argues that it suffered prejudice as a result of certain comments made by the court. (See Defendant's Memorandum of Law, January 25, 1999, p. 62 n. 20.) Since the defendant has failed to demonstrate that any of the individual rulings were erroneous, and if erroneous, caused harmful error, the defendant has not shown that it was denied a fair trial. Hence, there is no cumulative effect of error which would justify a new trial.
The defendant cites four instances where it claims that it was unduly prejudiced by the comments of the court. The first two instances claimed by the defendant occurred on the same day, November 25, 1998, the fourth day of a twenty-seven day trial, and related to the defendant's objections to the relevance of CT Page 16881 questions posed to the plaintiff on direct examination. In ruling on the objections, the court merely stated that the information sought was relevant to the issue of pretext, a subject which was clearly central to the case.
The next example cited by the defendant occurred on December 3, 1998, and simply reflects that the court agreed with the plaintiff's interpretation of the language in the faculty manual relating to affirmative action, an event that was no more likely to cause undue prejudice to the defendant than any other adverse evidentiary ruling. And finally, the defendant claims prejudice by the court's comment on December 23, 1999, in sustaining the plaintiff's objection to a leading question in the course of the defendant's direct examination of DePhillips that "99% of his questions were leading." Although this may have been an overstatement, it occurred in a sequence of questioning by the defendant's counsel which was replete with leading questions to which the plaintiff's counsel repeatedly objected. In hindsight, while the court's comment may have been improvident, it was not unduly prejudicial in the context of a trial which had numerous and continuing objections by both sides. In addition, the remark was made in a jocular way and was not deprecatory to the defendant. Counsel for the defendant apparently did not deem the incident of significance at the time because he did not move for a curative instruction on the day it occurred and never moved for a mistrial on this issue. It was only on January 5, 1999, after a long holiday recess, that the defendant requested a curative instruction which the court gave at the first opportunity.[14]
Thus, any prejudice which may have been caused by the remark was cured.
 CONCLUSION
The Motion for Judgment Notwithstanding the Verdict is denied as to counts one, three and four and granted as to count five. The Motion to Set Aside the Verdict is denied. The Motion for Statutory Reduction is granted in part and denied in part. The Motion for Remittitur is granted in part and denied in part. The Motion for a New Trial is denied.
In accordance with the foregoing memorandum, the court's order of September 27, 1999, which is incorporated herein, and the plaintiff's acceptance of the remittitur, judgment shall enter for the plaintiff in the amount of $3,021,304.00 as follows: CT Page 16882
Past economic damages $155,837.00 Increased tax liability 44,675.00
Future economic damages 344,990.00 Increased tax liability 125.802.00
Punitive damages (42 U.S.C. § 1981a) 300,000.00
Noneconomic damages (Conn. Gen. Stat. § 46a-104) 2,050,000.00 ____________ TOTAL $3,021,304.00
Peck, J.